Stephen R. Hackett, Esq.
Nevada Bar No.: 5010
David B. Barney, Esq.
Nevada Bar No.: 14681
SKLAR WILLIAMS PLLC
410 South Rampart Boulevard, Suite 350
Las Vegas, Nevada 89145
Telephone: (702) 360-6000
Facsimile:  (702) 360-0000
Email: shackett@sklar-law.com
        dbarney@sklar-law.com
*Attorneys for Defendant/Counterclaimant*
*CC Technology Corporation*

# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

| | |
|---|---|
| CAPITAL PURE ASSETS, LTD, a Nevada limited liability company,<br><br>Plaintiff,<br><br>v.<br><br>CC TECHNOLOGY CORPORATION, a Colorado corporation; DOES 1 through 10, inclusive; and ROE CORPORATIONS 1 through 10, inclusive,<br><br>Defendants. | Case No. 2:24-cv-00680-RFB-NJK<br><br>**DEFENDANT/COUNTERCLAIMANT CC TECHNOLOGY CORPORATION'S ANSWER AND COUNTERCLAIM**<br><br>**JURY DEMAND** |
| CC TECHNOLOGY CORPORATION, a Colorado corporation,<br><br>Counterclaimant,<br>v.<br><br>CAPITAL PURE ASSETS, LTD, a Nevada limited liability company; SHIVA PRAKASH, an individual; HANNAH DAWN PRAKASH, an individual; VIKHYAT PRAKASH, an individual; JAMES CHRISMAN, P.C., a Nevada professional corporation; JAMES P. CHRISMAN, an individual; DOES 1 through 10, inclusive; and ROE ENTITIES I through X, inclusive,<br><br>Counter-defendants. | |

1

Defendant/Counterclaimant CC Technology Corporation ("CCTC" or "Defendant"), by and through its counsel of record, the law firm of Sklar Williams PLLC, hereby responds to Plaintiff Capital Pure Assets, LTD's ("Capital Pure" or "Plaintiff") Complaint and Jury Demand ("Complaint") and admits, denies and alleges as follows:

**PARTIES**

1.  Answering Paragraph 1 of the Complaint, CCTC admits the allegations set forth therein.

2.  Answering Paragraph 2 of the Complaint, CCTC admits the allegations set forth therein.

**JURISDICTION AND VENUE**

3.  Answering Paragraph 3 of the Complaint calls for a legal conclusion, and therefore, CCTC need not respond to the allegations set forth therein.  Nonetheless, out of an abundance of caution, CCTC states that to the extent any of the allegations in Paragraph 3 of the Complaint may be construed as factual allegations against CCTC, CCTC denies each and every such allegation.

4.  Answering Paragraph 4 of the Complaint calls for a legal conclusion, and therefore, CCTC need not respond to the allegations set forth therein.  Nonetheless, out of an abundance of caution, CCTC states that to the extent any of the allegations in Paragraph 4 of the Complaint may be construed as factual allegations against CCTC, CCTC denies each and every such allegation.

**GENERAL ALLEGATIONS**

5.  Answering Paragraph 5 of the Complaint, CCTC is without sufficient knowledge or information upon which to form a belief as to the truth or falsity of the allegations set forth therein, and upon that basis denies each and every such allegation.

6.  Answering Paragraph 6 of the Complaint, CCTC admits that Terrence Patton serves as the Chairman of its Board.  CCTC denies each and every remaining and/or inconsistent allegation set forth in Paragraph 6 of the Complaint.

**A.  CCTC approaches CPA about forming a joint venture.**

7.  Answering Paragraph 7 of the Complaint, CCTC denies the allegations set forth therein.

2

8. Answering Paragraph 8 of the Complaint, CCTC admits that on or about May 22-23, 2023, and May 29-31, 2023, Thomas Gavin and Robert Lang traveled to Las Vegas, Nevada to discuss a possible joint venture with Capital Pure. CCTC denies each and every remaining and/or inconsistent allegation set forth in Paragraph 8 of the Complaint.

9. Answering Paragraph 9 of the Complaint, CCTC admits that during discussions about a possible joint venture, the parties discussed Capital Pure providing a Standby Letter of Credit ("SBLC") for certain projects, and that the parties would split the profits therefrom. CCTC denies each and every remaining and/or inconsistent allegation set forth in Paragraph 9 of the Complaint.

10. Answering Paragraph 10 of the Complaint, CCTC denies the allegations set forth therein.

11. Answering Paragraph 11 of the Complaint, CCTC admits that on or about November 14, 2023, Capital Pure provided CCTC personnel with a document titled Business Submission Criteria for Invent Considerations, and that the document speaks for itself. CCTC denies each and every remaining and/or inconsistent allegation set forth in Paragraph 11 of the Complaint.

**B. CCTC proposes that the parties invest in a cannabis company, but CPA declines to invest based on concerns over the project's viability.**

12. Answering Paragraph 12 of the Complaint, CCTC admits that the parties discussed forming a joint venture relating to the Fintech space. CCTC denies each and every remaining and/or inconsistent allegation set forth in Paragraph 12 of the Complaint.

13. Answering Paragraph 13 of the Complaint, CCTC denies the allegations set forth therein.

14. Answering Paragraph 14 of the Complaint, CCTC denies the allegations set forth therein.

**C. CCTC proposes that the parties invest in a Chicago real estate project.**

15. Answering Paragraph 15 of the Complaint, CCTC admits that Thomas Gavin referred a real estate project to Capital Pure (the "Timber Development"), based on Capital Pure's

representations that it was able to fund large real estate projects for development.  CCTC denies each and every remaining and/or inconsistent allegation set forth in Paragraph 15 of the Complaint.

16.     Answering Paragraph 16 of the Complaint, CCTC admits that the Timber Development involved the purchase of a large historic building in downtown Chicago that would be converted into Class A multifamily residences.  The pitch deck for that project promised impressive returns, based in part on the building's close proximity to both Google's new Chicago headquarters and roughly 80,000 students.  CCTC denies each and every remaining and/or inconsistent allegation set forth in Paragraph 16 of the Complaint.

17.     Answering Paragraph 17 of the Complaint, CCTC admits that the pitch deck relating to the Timber Development indicated the project was actively seeking capital investments.  CCTC denies each and every remaining and/or inconsistent allegation set forth in Paragraph 17 of the Complaint.

18.     Answering Paragraph 18 of the Complaint, CCTC admits that a video call was held on or about June 7, 2023, to discuss the Timber Development, and that the call was attended by Vikhyat Prakash and Shiva Prakash of Capital Pure, Thomas Gavin, and Kevin Seivers.  CCTC denies each and every remaining and/or inconsistent allegation set forth in Paragraph 18 of the Complaint.

19.     Answering Paragraph 19 of the Complaint, CCTC denies the allegations set forth therein.

20.     Answering Paragraph 20 of the Complaint, CCTC admits that Thomas Gavin advised he had relationships with labor unions that would help facilitate the Timber Development.  CCTC denies each and every remaining and/or inconsistent allegation set forth in Paragraph 20 of the Complaint.

21.     Answering Paragraph 21 of the Complaint, CCTC denies the allegations set forth therein.

22.     Answering Paragraph 22 of the Complaint, CCTC denies the allegations set forth therein.

/ / /

4

**D. Background on how SBLCs work.**

23. Answering Paragraph 23 of the Complaint, CCTC is without sufficient knowledge or information upon which to form a belief as to the truth or falsity of the allegations set forth therein, and upon that basis denies each and every such allegation.

24. Answering Paragraph 24 of the Complaint, CCTC is without sufficient knowledge or information upon which to form a belief as to the truth or falsity of the allegations set forth therein, and upon that basis denies each and every such allegation.

25. Answering Paragraph 25 of the Complaint, CCTC is without sufficient knowledge or information upon which to form a belief as to the truth or falsity of the allegations set forth therein, and upon that basis denies each and every such allegation.

26. Answering Paragraph 26 of the Complaint, CCTC is without sufficient knowledge or information upon which to form a belief as to the truth or falsity of the allegations set forth therein, and upon that basis denies each and every such allegation.

27. Answering Paragraph 27 of the Complaint, CCTC is without sufficient knowledge or information upon which to form a belief as to the truth or falsity of the allegations set forth therein, and upon that basis denies each and every such allegation.

28. Answering Paragraph 28 of the Complaint, CCTC is without sufficient knowledge or information upon which to form a belief as to the truth or falsity of the allegations set forth therein, and upon that basis denies each and every such allegation.

29. Answering Paragraph 29 of the Complaint, CCTC denies the allegations set forth therein.

**E. The parties execute the Joint Venture Agreement.**

30. Answering Paragraph 30 of the Complaint, CCTC admits that it entered into a Joint Venture Agreement (the "JVA") with Capital Pure on or about June 26, 2023, relating to the Fintech space, and that the document speaks for itself. CCTC denies each and every remaining and/or inconsistent allegation set forth in Paragraph 30 of the Complaint.

31. Answering Paragraph 31 of the Complaint, CCTC states that the JVA speaks for itself. CCTC denies each and every allegation set forth in Paragraph 31 of the Complaint, which

is inconsistent with the JVA.

32. Answering Paragraph 32 of the Complaint, CCTC states that the JVA speaks for itself. CCTC denies each and every allegation set forth in Paragraph 32 of the Complaint, which is inconsistent with the JVA.

33. Answering Paragraph 33 of the Complaint, CCTC states that the JVA speaks for itself. CCTC denies each and every allegation set forth in Paragraph 33 of the Complaint, which is inconsistent with the JVA.

34. Answering Paragraph 34 of the Complaint, CCTC states that the JVA speaks for itself. CCTC denies each and every allegation set forth in Paragraph 34 of the Complaint, which is inconsistent with the JVA.

35. Answering Paragraph 35 of the Complaint, CCTC states that the JVA speaks for itself. CCTC denies each and every allegation set forth in Paragraph 35 of the Complaint, which is inconsistent with the JVA.

36. Answering Paragraph 36 of the Complaint, CCTC states that the JVA speaks for itself. CCTC denies each and every allegation set forth in Paragraph 36 of the Complaint, which is inconsistent with the JVA.

37. Answering Paragraph 37 of the Complaint, CCTC is without sufficient knowledge or information upon which to form a belief as to the truth or falsity of the allegations set forth therein, and upon that basis denies each and every such allegation.

38. Answering Paragraph 38 of the Complaint, CCTC denies the allegations set forth therein.

39. Answering Paragraph 39 of the Complaint, CCTC denies the allegations set forth therein.

**F. CPA fully performs under the JVA by starting the SBLC process, but the process cannot be completed because CCTC does not actually have any viable projects to fund.**

40. Answering Paragraph 40 of the Complaint, CCTC admits that it deposited $336,000 into escrow, in accordance with the JVA. CCTC denies each and every remaining and/or

inconsistent allegation set forth in Paragraph 40 of the Complaint.

41. Answering Paragraph 41 of the Complaint, CCTC admits that it obtained a loan to fund $336,000 into escrow under the JVA, and that Capital Pure knew at all times that it obtained a loan to do so.  CCTC denies each and every remaining and/or inconsistent allegation set forth in Paragraph 41 of the Complaint.

42. Answering Paragraph 42 of the Complaint, CCTC denies the allegations set forth therein.

43. Answering Paragraph 43 of the Complaint, CCTC denies the allegations set forth therein.

44. Answering Paragraph 44 of the Complaint, CCTC denies the allegations set forth therein.

45. Answering Paragraph 45 of the Complaint, CCTC denies the allegations set forth therein.

46. Answering Paragraph 46 of the Complaint, CCTC denies the allegations set forth therein.

47. Answering Paragraph 47 of the Complaint, CCTC denies the allegations set forth therein.

48. Answering Paragraph 48 of the Complaint, CCTC denies the allegations set forth therein.

49. Answering Paragraph 49 of the Complaint, CCTC denies the allegations set forth therein.

50. Answering Paragraph 50 of the Complaint, CCTC denies the allegations set forth therein.

51. Answering Paragraph 51 of the Complaint, CCTC denies the allegations set forth therein.

52. Answering Paragraph 52 of the Complaint, CCTC admits that on or about September 21, 2023, it requested the return of the funds it placed in escrow based on Capital Pure's failure to comply with the JVA, and that such communication speaks for itself.  CCTC denies each

and every remaining and/or inconsistent allegation set forth in Paragraph 52 of the Complaint.

53. Answering Paragraph 53 of the Complaint, CCTC denies the allegations set forth therein.

54. Answering Paragraph 54 of the Complaint, CCTC admits that in reliance on Capital Pure's representations that it could and would obtain the SBLC, CCTC agreed to continue with the joint venture memorialized in the JVA. CCTC denies each and every remaining and/or inconsistent allegation set forth in Paragraph 54 of the Complaint.

**G. CCTC abandons the Joint Venture without providing a single viable project to invest in.**

55. Answering Paragraph 55 of the Complaint, CCTC admits that on or about March 1, 2024, it demanded the return of its escrow funds based on Capital Pure's failure to comply with the JVA. CCTC denies each and every remaining and/or inconsistent allegation set forth in Paragraph 55 of the Complaint.

56. Answering Paragraph 56 of the Complaint, CCTC admits that it sent Capital Pure a letter advising that Capital Pure had breached the JVA. CCTC denies each and every remaining and/or inconsistent allegation set forth in Paragraph 56 of the Complaint.

57. Answering Paragraph 57 of the Complaint, CCTC admits that Capital Pure's conduct in connection with the JVA has caused CCTC significant damages, and that CCTC's correspondence speaks for itself. CCTC denies each and every remaining and/or inconsistent allegation set forth in Paragraph 57 of the Complaint.

**FIRST CAUSE OF ACTION**

**Breach of Contract**

58. Answering Paragraph 58 of the Complaint, CCTC repeats and realleges its responses to Paragraphs 1 through 57 of the Complaint, as though fully set forth herein.

59. Answering Paragraph 59 of the Complaint, CCTC admits that CCTC and Capital Pure entered into to the JVA, and that the document speaks for itself. CCTC denies each and every remaining and/or inconsistent allegation set forth in Paragraph 59 of the Complaint.

60. Answering Paragraph 60 of the Complaint calls for a legal conclusion, and

8

therefore, CCTC need not respond to the allegations set forth therein. Nonetheless, out of an abundance of caution, CCTC states that to the extent any of the allegations in Paragraph 60 of the Complaint may be construed as factual allegations against CCTC, CCTC denies each and every such allegation.

61. Answering Paragraph 61 of the Complaint, CCTC denies the allegations set forth therein.

62. Answering Paragraph 62 of the Complaint, CCTC denies the allegations set forth therein.

63. Answering Paragraph 63 of the Complaint, CCTC states that the JVA speaks for itself. CCTC denies each and every allegation set forth in Paragraph 63 of the Complaint, which is inconsistent with the JVA.

64. Answering Paragraph 64 of the Complaint, CCTC denies the allegations set forth therein.

65. Answering Paragraph 65 of the Complaint, CCTC denies the allegations set forth therein.

66. Answering Paragraph 66 of the Complaint, CCTC denies the allegations set forth therein.

67. Answering Paragraph 67 of the Complaint, CCTC denies the allegations set forth therein.

## SECOND CAUSE OF ACTION

### Breach of the Implied Covenant of Good faith and Fair Dealing

68. Answering Paragraph 68 of the Complaint, CCTC repeats and realleges its responses to Paragraphs 1 through 67 of the Complaint, as though fully set forth herein.

69. Answering Paragraph 69 of the Complaint calls for a legal conclusion, and therefore, CCTC need not respond to the allegations set forth therein. Nonetheless, out of an abundance of caution, CCTC states that to the extent any of the allegations in Paragraph 69 of the Complaint may be construed as factual allegations against CCTC, CCTC denies each and every such allegation.

9

70.    Answering Paragraph 70 of the Complaint, CCTC admits that CCTC and Capital Pure entered into to the JVA, and that the document speaks for itself.  CCTC denies each and every remaining and/or inconsistent allegation set forth in Paragraph 70 of the Complaint.

71.    Answering Paragraph 71 of the Complaint, CCTC denies the allegations set forth therein.

72.    Answering Paragraph 72 of the Complaint, CCTC denies the allegations set forth therein.

73.    Answering Paragraph 73 of the Complaint, CCTC denies the allegations set forth therein.

### THIRD CAUSE OF ACTION

**Declaratory Relief**

74.    Answering Paragraph 74 of the Complaint, CCTC repeats and realleges its responses to Paragraphs 1 through 73 of the Complaint, as though fully set forth herein.

75.    Answering Paragraph 75 of the Complaint calls for a legal conclusion, and therefore, CCTC need not respond to the allegations set forth therein.  Nonetheless, out of an abundance of caution, CCTC states that to the extent any of the allegations in Paragraph 75 of the Complaint may be construed as factual allegations against CCTC, CCTC denies each and every such allegation.

76.    Answering Paragraph 76 of the Complaint calls for a legal conclusion, and therefore, CCTC need not respond to the allegations set forth therein.  Nonetheless, out of an abundance of caution, CCTC states that to the extent any of the allegations in Paragraph 76 of the Complaint may be construed as factual allegations against CCTC, CCTC denies each and every such allegation.

77.    Answering Paragraph 77 of the Complaint, CCTC is without sufficient knowledge or information upon which to form a belief as to the truth or falsity of the allegations set forth therein, and upon that basis denies each and every such allegation.

78.    Answering Paragraph 78 of the Complaint, CCTC denies the allegations set forth therein.

**<u>AFFIRMATIVE DEFENSES</u>**

CCTC, without altering the burdens of proof that the parties must bear, asserts the following affirmative defenses to the Complaint and the claims asserted therein, and CCTC specifically incorporates into its affirmative defenses the answers to the preceding paragraphs, as if fully set forth herein.

1. The Complaint fails to state a claim for relief against CCTC upon which relief can be granted.

2. Capital Pure's claims are barred in whole or in part by fraud or misrepresentation perpetrated on CCTC by Capital Pure.

3. Capital Pure is barred from any relief against CCTC based on Capital Pure's own misrepresentations, omissions, actions, and/or failures to act.

4. Capital Pure is barred from any relief against CCTC because Capital Pure failed to satisfy conditions precedent and/or subsequent.

5. Capital Pure is barred from any relief against CCTC based on Capital Pure's breach of its own contractual duties and/or obligations.

6. Capital Pure is barred from any relief against CCTC based on Capital Pure's breach of its own covenants of good faith and fair dealing.

7. Capital Pure's claims for relief are barred by the doctrines of estoppel, laches, and/or unclean hands.

8. Capital Pure's claims for relief are barred based on the doctrine of waiver.

9. Capital Pure's claims for relief are barred based on the doctrine of accord and satisfaction.

10. Capital Pure is barred from any relief against CCTC because Capital Pure was not damaged, if at all, to the extent claimed by Capital Pure in the Complaint, and/or such damages, if any, were not proximately caused by an action or inaction of CCTC.

11. CCTC alleges that it has suffered damages from Capital Pure's conduct and has a right to offset or setoff against Capital Pure's damages, if any, including attorneys' fees and costs incurred in this matter.

12. Capital Pure, through the exercise of reasonable effort, could have mitigated its damages, if any but has failed and refused, and continues to fail and refuse, to exercise a reasonable effort to mitigate or prevent avoidable damages, and is therefore barred from seeking recovery of such alleged damages.

13. Capital Pure's claims are barred by the statute of frauds and/or the parol evidence rule.

14. Capital Pure's claims are barred by the assumption of risk doctrine.

15. Capital Pure's damages, if any, were caused by the acts or omissions of Capital Pure and/or third parties over which CCTC had no control, and therefore, Capital Pure is precluded from any recovery against CCTC based on such conduct.

16. Any recovery by Capital Pure must be settled, reduced, abated, offset and/or apportioned to the extent that any other party's or non-party's actions, including those of Capital Pure, caused or contributed to Capital Pure's damages, if any.

17. Capital Pure's claims are barred because CCTC acted at all times in good faith, in accordance with its contractual and/or legal rights and obligations, and in conformity with all applicable laws and regulations, and therefore did not act improperly.

18. Capital Pure's claims are barred because any acts or omissions of CCTC were superseded by the acts or omissions of others, including Capital Pure, which were intervening, independent, proximate and legal causes of any injury, damage or loss to Capital Pure, either as alleged or otherwise.

19. Capital Pure's claims are barred because CCTC performed no acts, deeds, omissions or failures to act relevant to the subject matter of Capital Pure's Complaint, which would create any liability or duty whatsoever on the part of CCTC to Capital Pure.

20. Capital Pure's claims are barred because Capital Pure has suffered no damages herein and is seeking to obtain a windfall from CCTC.

21. CCTC is entitled to recover its reasonable costs and attorneys' fees incurred in defending against the claims in Capital Pure's Complaint, which were brought or maintained without reasonable ground or to harass CCTC.

22. CCTC is entitled to sanctions against Capital Pure, based on Capital Pure's maintenance of claims without a reasonable ground, to harass CCTC, and otherwise for an improper purpose and without conducting a reasonable investigation prior to filing suit.

23. Capital Pure's claims are barred because CCTC owed no duty to Capital Pure as alleged in the Complaint.

24. Without admitting that the Complaint states a viable claim for relief, any remedies are limited to the extent there is sought an overlapping or duplicative recovery for the various claims against CCTC or others for any alleged single wrongdoing.

25. CCTC denies each and every allegation in the Complaint that is not specifically admitted herein. This includes, without limitation, any factual allegations contained in headings or subheadings in the Complaint.

26. CCTC hereby incorporates by reference those affirmative defenses enumerated in Rule 8 of the Federal Rules of Civil Procedure. In the event further investigation or discovery reveals the applicability of any such defenses, CCTC reserves the right to seek leave of the Court to amend its Answer to specifically assert the same. Such defenses are incorporated herein by reference for the specific purpose of not waiving the same.

27. Pursuant to Federal Rule of Civil Procedure 11, to the extent that additional affirmative defenses have not been alleged herein, including, without limitation, due to sufficient facts being unavailable despite reasonable inquiry, Defendants reserve the right to amend this Answer to allege any and all such additional affirmative defenses.

**<u>PRAYER FOR RELIEF</u>**

WHEREFORE, CCTC prays for judgment against Capital Pure as follows:

1. That judgment be entered in CCTC's favor on all claims for relief and that the Complaint be dismissed with prejudice;

2. That Capital Pure take nothing by way of the Complaint;

3. That CCTC be awarded its reasonable attorneys' fees, expert witness fees, and all other costs or expenses incurred in connection with its defense of this matter; and

4. For all other and further relief as the Court may deem just and proper.

**COUNTERCLAIM**

Counterclaimant CC Technology Corporation ("CCTC"), by and through its counsel of record, the law firm of Sklar Williams PLLC, as and for its Counterclaim (hereinafter "Counterclaim") alleges as follows:

**NATURE OF THE ACTION**

1. Second only to the "Nigerian Prince" scam is the Standby Letter of Credit Scheme. The FBI,[1] the SEC,[2] and a variety of other governmental agencies[3] have routinely warned about this type of scam for a number of years. Unfortunately, individuals like the Counter-defendants in this matter continue to perpetrate this fraudulent scheme.

2. The basic components of the Standby Letter of Credit ("SBLC") Scheme are as follows: (i) a fraud actor will fabricate a business and claim to have financial industry connections that enable him or her to access a SBLC—a bank's guarantee that certain funds will be paid—for a significant amount of money; (ii) the fraud actor will ask that a victim deposit funds into an escrow account that will be held and managed by a co-conspirator; (iii) the fraud actor will promise to deliver the SBLC once the escrow funds are deposited; and (iv) once the escrow funds are deposited, the fraud actor fails to deliver the SBLC and, instead, steals the funds deposited into escrow. *See supra*, nn. 1-3. This is the exact formula followed by the Counter-defendants in this case.

3. In or around May 2023, the Counter-defendants represented to CCTC that they have a reputable business and connections to the financial industry, including that they have access to significant funds coming directly from their clients' family offices located in India; (ii) Counter-

---

[1] *See, e.g.*, Public Services Announcement, Federal Bureau of Investigation, *FBI Warns of Fraud Actors Scamming Investors through Fictitious Standby Letters of Credit*, https://www.ic3.gov/Media/Y2019/PSA190318 (last visited Jun. 11, 2024).

[2] *See, e.g.*, Investor Alerts and Bulletins, U.S. Securities and Exchange Commission, *Investor Alert: "Prime Bank" Investments Are Scams*, https://www.sec.gov/resources-investors/investor-alerts-bulletins/prime-bank-investments-scams (last visited Jun. 11, 2024).

[3] *See, e.g.*, Press Release, United States Attorney's Office for the Eastern District of Virginia, *Fraudsters Sentenced for Standby Letters of Credit Scheme*, https://www.justice.gov/usao-edva/pr/fraudsters-sentenced-standby-letters-credit-scheme-1 (last visited Jun. 11, 2024).

14

defendants told CCTC that they could obtain a SBLC in the amount of $50 million, but requested that CCTC deposit into escrow $336,000, to pay the fees associated with obtaining the SBLC from a bank; (iii) Counter-defendants promised to obtain the SBLC once the escrow funds were deposited into an escrow account in their company name that was managed by a co-conspirator; and (iv) after CCTC deposited $336,000 into the escrow account, Counter-defendants have refused to return those funds or otherwise obtain the SBLC they promised.

4.     CCTC has made numerous demands on both the fraud actors and the purported escrow agent, for the return of their funds and to otherwise be made whole in light of this scheme, to no avail.

5.     Instead of following their word in obtaining the SBLC or, at the very least, returning the escrow funds to CCTC, Counter-defendants have chosen to double down on their fraudulent conduct by filing a sham lawsuit against CCTC first, presumably thinking that the best defense is a good offense.  But filing a sham complaint will not deter CCTC from pursuing its claims against the Counter-defendants.  CCTC therefore files this Counterclaim to be made whole in light of the Counter-defendants' fraudulent conduct, including their filing of the sham Complaint that initiated this lawsuit.

## THE PARTIES

6.     CCTC is, and at all times herein relevant was, a Colorado corporation with its principal place of business in Boulder, Colorado.

7.     Counter-defendant Capital Pure Assets, LTD ("Capital Pure") is, and at all times herein relevant was, a Nevada limited liability company with its principal place of business in Las Vegas, Nevada.

8.     Counter-defendant Shiva Prakash ("Shiva") is, and at all times herein relevant was, an individual residing in Clark County, Nevada.

9.     Counter-defendant Hannah Dawn Prakash ("Hannah") is, and at all times herein relevant was, an individual residing in Clark County, Nevada.  Upon information and belief, Shiva and Hannah—a married couple—are the sole owners and Managers of Capital Pure.

10.     Counter-defendant Vikhyat Prakash ("Vikhyat") is, and at all times herein relevant

15

was, an individual residing in Clark County, Nevada. At all times relevant to this lawsuit, Vikhyat held himself out, and upon information and belief continues to hold himself out, as a Strategic Advisor and/or VP of Business Development for Capital Pure. Vikhyat is also Shiva's son.

11. Counter-defendant James Chrisman, P.C. ("Chrisman P.C.") is, and at all times herein relevant was, a Nevada professional corporation with its principal place of business in Las Vegas, Nevada.

12. Counter-defendant James P. Chrisman ("Chrisman") is, and at all times herein relevant was, an individual residing in Clark County, Nevada, and a licensed Nevada attorney. Upon information and belief, Chrisman is the sole owner and President of Chrisman P.C.

13. The true names and capacities, whether corporate, individual, or otherwise, of Defendant Does 1 through 10, inclusive, and Roe Entities I through X, inclusive, are unknown to CCTC, who therefore sues such Defendants by fictitious names. CCTC is informed and believes, and thereon alleges, that each Defendant designated as a Doe and Roe Entity is legally responsible in some manner or means for the damages to CCTC, as alleged herein, either through its contractual duty, conduct, or through the conduct of its agents, servants, employees or insurers, which resulted in injury and damages to CCTC as alleged herein. CCTC will ask for leave of Court to amend this Complaint to insert the true names and capacities of said Defendant Does 1 through 10, inclusive, and Roe Entities I through X, inclusive, when the same have been ascertained by CCTC, together with the appropriate charging allegations, and to join said Defendant(s) in this action.

## **JURISDICTION AND VENUE**

14. This Court has subject matter jurisdiction over this matter under 28 U.S.C. § 1332, because complete diversity of citizenship exists and the amount in controversy exceeds $75,000, exclusive of interest and costs.

15. Venue is proper in this Court under 28 U.S.C. § 1391(b)(1), because all of the Counter-defendants reside in Clark County, Nevada. Venue is also proper under 28 U.S.C. § 1391(b)(2), because a substantial part of the events or omissions giving rise to this action occurred in this district.

**GENERAL ALLEGATIONS**

16.    CCTC is a wholly owned subsidiary of Cannatrac Financial Corp. ("Cannatrac"), a Fintech company with a focus on payment processing systems in the cannabis industry.  CCTC provides technology consulting services on a variety of projects being developed and/or marketed by Cannatrac.

17.    Beginning in or around 2022, CCTC—along with other Cannatrac affiliates— began developing and marketing "CannaCard," a cashless payment and reward system that could be used in the cannabis industry.  Cannatrac, as well as CCTC, have spent significant funds and other resources toward the successful development, launch, and marketing of the CannaCard product and brand.

18.    In or around early May 2023, while CCTC was still in the process of marketing CannaCard, an acquaintance of CCTC personnel, Mr. Parind Parekh, advised that he knew of a company in Las Vegas that may be able to provide funding for CCTC, to enable the company to scale CannaCard to its desired level.  Mr. Parekh introduced CCTC to Capital Pure and invited CCTC's representatives, Mr. Thomas Gavin and Mr. Robert Lang, to meet with him and Capital Pure in Las Vegas to discuss potential funding opportunities.

19.    On or about May 22, 2023, Mr. Gavin and Mr. Lang traveled to Las Vegas and met with Shiva and Vikhyat regarding a potential business relationship between CCTC and Capital Pure.

20.    During their first meeting, Shiva and Vikhyat represented to CCTC that Capital Pure had significant experience funding projects in a variety of industries, including, but not limited to, technology, defense, and aerospace.  Shiva and Vikhyat further represented that Capital Pure had access to significant funds directly from its clients' family offices in India, that could be used for investment in CCTC's business, including CannaCard.

21.    Based on these initial representations regarding Capital Pure and its business, CCTC decided to engage in further discussions regarding a potential business arrangement between the parties.  In particular, the parties circulated a draft of a "Tri Party Joint Venture Agreement," which contemplated a joint venture between CCTC, Capital Pure, and an entity

17

belonging to Mr. Parekh.  Mr. Gavin and Mr. Lang came to Las Vegas once more on or about May 29, 2023, to discuss this arrangement with Capital Pure and Mr. Parekh in greater detail.

22.　On or about May 29, 2023, based on Shiva's and Vikhyat's continued assurance that Capital Pure had a track record of success and the ability to fund the parties' projects, CCTC agreed to proceed with the arrangement contemplated by the parties.  However, Capital Pure and CCTC ultimately entered into this arrangement without Mr. Parekh.

23.　As a result of the parties' conversations, and in reliance on Shiva's and Vikhyat's representations about Capital Pure's success, capabilities, and access to capital, CCTC entered into a "Joint Venture Agreement" with Capital Pure on or about June 26, 2023 (hereinafter, the "JVA").  The JVA was signed by Hannah on behalf of Capital Pure.

24.　The JVA centered around CCTC's development and management of the CannaCard brand, and several other minor projects that CCTC was managing.  The parties agreed that Capital Pure will provide CCTC with funding in the amount of $20 million, as well as a SBLC in the amount of $50 million, for CCTC to further develop and build the CannaCard brand and other projects that CCTC was managing.  The parties would then split the profits of their venture.

25.　To obtain the SBLC, however, Capital Pure demanded that CCTC deposit into escrow a total of $336,000, to be used by Capital Pure to pay the alleged bank fees associated with obtaining the SBLC.  This entire arrangement is memorialized in the JVA, and in particular, Section 3 of the agreement, which provides as follows:

SECTION 3: TRANSACTION PROCEDURES

    A.　Deposit of Escrow: within one (1) banking day upon signing this agreement JV partners will fund escrow account.

    B.　Verification of Escrow: Investor's escrow attorney will verify the funds are clean and unencumbered funds and have been deposited into the nominated escrow account as in Annex 1.

    C.　SBLC Verbiage and Application Process: Investor will instruct their bank to start the process of issuance.  Which includes allocating cash funds, communicating with the credit risk departments of the bank and other ancillary activities.

/ / /

18

D. <u>SBLC Pre Advice:</u> INVESTOR will instruct the bank to send a MT799 Pre-Advice message to the monetizer's bank.  This will be a conditional block of funds message.

E. <u>Issuance of MT760:</u> INVESTOR will instruct their bank to send the SBLC via MT760 directly to the Monetizer's Bank.  At this point Escrow Funds are released to the bank to pay for this transmission of the SBLC to monetizer bank.

F. <u>Monetization of SBLC:</u> Monetization will follow the monetization term sheet provided in Step E.  Generally, monetization will occur within 21 days of receiving the SBLC Instrument.  Once Monetization is done JV PARTNER's loan amount is deposited into their nominated bank account.

G. <u>Usage of Funds:</u> As Joint Venture Partners both INVESTOR and JV PARTNERS will conduct review of each project portfolio company and their specific growth strategies and capital requirements.

26. "Annex 1" of the JVA designated Chrisman as Capital Pure's escrow attorney, who would hold the funds in trust in accordance with the parties' agreement.  The document also contained a copy of Chrisman's passport, and further stated that the name of the account in which the escrow funds would be held is "Capital Pure Assets LLC – Treasury/Escrow."  Annex 1 stated that the amount to be funded into escrow was $336,000, which is equal to the alleged bank fees of .672% of the SBLC amount.

27. In connection with their entry into the JVA, the parties also executed a document titled "Escrow Agreement."  The Escrow Agreement was executed by CCTC, Capital Pure, and Chrisman, P.C., as the escrow agent.  Once again, Hannah signed the Escrow Agreement on behalf of Capital Pure, and Chrisman signed on behalf of Chrisman, P.C.

28. Under the Escrow Agreement, the parties agreed that CCTC's deposit of $336,000, as required under the JVA, shall be deposited into a designated escrow account held and managed by Chrisman, P.C.  The Escrow Agreement further provides that Chrisman, P.C. has identified Chrisman to serve as a signatory on the account.

29. Section 3 of the Escrow Agreement set forth the terms under which Chrisman, P.C., as "ESCROW," was required to release the escrow funds to either CCTC, as "JV PARTNER," or Capital Pure, as "INVESTOR."  That section provides as follows:

/ / /

19

**3.       RELEASE OF FUNDS**

3.1  Under no circumstances shall INVESTOR seek or accept release of the Deposit of JV PARTNER to INVESTOR until after consummation of the JV Agreement, as evidenced by the acceptance of the requisite documents set forth therein.

3.2 ESCROW shall release the Deposit to INVESTOR as directed:

3.2.1 pursuant to the terms and conditions set forth in the JV Agreement and this Agreement, upon receipt of (a) An MT799 issued from Investor's Bank to Monetizer Bank; (b) A Term Sheet from the Monetization Partner; and (c) An MT799/MT199 Issued from the Monetizer's Bank to the Investor's Bank or

3.2.2 in a subsequent writing signed by both JV Partner, and Investor; or

3.2.3 by a final, non-appealable order or judgment of a court.

3.3 **If ESCROW is not directed to release the Deposit pursuant to paragraph 3.2 above, and ESCROW receives a request by either INVESTOR or JV PARTNER, to release the Deposit, then ESCROW must give both the JV PARTNER, and INVESTOR prior written notice of not fewer than thirty (30) business days before releasing the Deposit.  If ESCROW has not received notice of objection to the release of the Deposit prior to the expiration of said thirty (30) day period, the Deposit shall be released, and ESCROW shall provide further written notice to all parties JV PARTNER, and INVESTOR informing them of said release**.  If ESCROW receives a written notice from either JV PARTNER or INVESTOR objecting to the release of the Deposit within said thirty (30) day period, ESCROW shall continue to hold the Deposit until otherwise directed pursuant to paragraph 3.2 above.  Notwithstanding the foregoing, ESCROW shall have the right at any time to deposit the Deposit contained in the ESCROW Account with the Clerk of the county where the Bank is located and shall give written notice to both INVESTOR, and JV PARTNER, of such deposit.

(bold added)

30.       The Escrow Agreement further provides that "[a] fiduciary relationship shall exist between ESCROW and Investor / JV partner, and ESCROW acknowledges its fiduciary and statutory obligations," as well as the fact that "INVESTOR agrees that it shall not interfere with Escrow['s] performance of its fiduciary duties or statutory obligations as set forth herein."

31.       In accordance with the terms of the JVA and the Escrow Agreement, CCTC deposited $336,000 into the escrow account designated by Capital Pure and Chrisman, P.C.

20

32. CCTC advised the Counter-defendants prior to such deposit, and Counter-defendants were otherwise aware, that CCTC took out a loan for the amount that was deposited into escrow and that the loan was incurring a significant amount of interest. CCTC was only willing to do this based on the representations of Capital Pure and the individual Counter-defendants, regarding Capital Pure's ability to secure the SBLC in accordance with the parties' agreements.

33. From late July to August of 2023, CCTC followed up with Capital Pure regarding the progress of the funding required to be delivered under the JVA. After a series of phone calls in which Capital Pure assured CCTC that the funding was in process, CCTC advised Capital Pure that it was concerned about the lack of movement on Capital Pure's side under the JVA and requested some written confirmation that at least the funds Capital Pure agreed to deliver would be released to CCTC soon.

34. On August 23, 2023—contrary to the allegations in the Complaint stating that Capital Pure was not interested in any Cannatrac-related investments and that the JVA did not have anything to do with Cannatrac—Vikhyat e-mailed CCTC, advising that Capital Pure was "in a position to get the funding of 20M to CannaCard." Vikhyat further represented that "[w]e are targeting the date of September 15th for the distribution of funds."

35. In reliance on Vikhyat's statements, CCTC agreed to wait until September 15 for delivery of the funds.

36. On September 21, 2023, when Capital Pure failed to deliver the funds as promised, CCTC sent Capital Pure an e-mail stating that "due to time restrictions on our money, we are requesting return of our $336,000 in escrow funds." CCTC further provided wire instructions for the return of the escrow deposit.

37. Shiva quickly responded by saying that Capital Pure will process the termination of the escrow agreement and the JVA altogether.

38. On September 25, 2023, when CCTC had not received the escrow funds and could not get ahold of Capital Pure in connection with the same, CCTC once again e-mailed Capital Pure asking for an update regarding its return of the escrow funds. Shiva immediately responded by

asking for a call with CCTC on September 29, 2023.

39.     The parties had a call on September 29, 2023, in which Shiva represented to Mr. Gavin that the MT799 Pre-Advice message—required to be obtained by Capital Pure to obtain the SBLC—had already been obtained and that Capital Pure was in the process of obtaining the SBLC.

40.     In reliance on Shiva's representation that the MT799 had already been processed and that the SBLC would soon be issued, CCTC agreed to rescind its request for the return of the escrow funds and cancellation of the JVA altogether.

41.     The parties had several calls after CCTC rescinded its cancellation of the JVA, in which Shiva and Vikhyat represented to CCTC, including Mr. Gavin, that the SBLC was still in process and that it would be issued shortly.

42.     In November of 2023, however, when CCTC **still** had not received any movement by way of the $20 million promised or the SBLC being issued, and the company was receiving pressure from its investors to secure the funding, it stressed to Capital Pure the importance of a message to the investors, to show that the funding would be delivered shortly.

43.     On or about December 6, 2023, Shiva sent a message on Capital Pure letterhead, in which it represented to CCTC and its investors that the funding was on its way.  The letter stated— once again, demonstrating the allegations in the Complaint are completely false—the following, in pertinent part:

> I hope this letter finds you well.  As we approach the end of the year, I wanted to take a moment to update you on the progress of our joint venture, specifically regarding the final stages of monetization and funding.
>
> Firstly, I would like to express our excitement about the potential of CannaTrac and CC Technology Corp in the realm of customer rewards and real-life gifts in the cannabis industry.  We believe that this innovative approach has significant market potential and aligns well with current customer trends.
>
> Regarding the timeline, as you are aware, the final stages of project monetization are intricate, requiring meticulous attention to detail and compliance with various regulatory standards.  Our team is diligently working to ensure that all aspects of the project are aligned with these requirements.
>
> However, it is important to acknowledge the impact of the upcoming holiday season.  The end-of-year holidays typically see a slowdown in various operational

processes, both within our firm and among our external partners and regulatory bodies. This seasonal period necessitates a brief hiatus in certain activities, which invariably affects project timelines.

**With this in consideration, we anticipate that the final monetization and funding phase of your project will be concluded in the first quarter of the following year around Feb 1st week timeline**. We expect that all necessary processes will resume promptly after the holiday break, and our team will be fully engaged in bringing this phase to a successful close.

We understand that timing is crucial, and I assure you that we are committed to advancing your project with the utmost efficiency and care. Our team will maintain regular communication with you, providing updates and any support you may need during this period.

. . .

Thank you for your continued trust in Capital Pure Assets. We look forward to a prosperous new year and the successful realization of your project.

(bold added)

44. February 1 came and went, and notwithstanding Capital Pure's continued promises to deliver funds, neither funds nor the SBLC ever came.

45. Once again, with increased pressure from its lender and investors and no progress on Capital Pure's performance under the JVA, CCTC demanded some movement on the part of Capital Pure by the end of February. Capital Pure did not respond by the end of February 2024.

46. Without receiving sufficient, if any response to CCTC's demands, on or about March 1, 2024, CCTC delivered a demand letter to Chrisman and Capital Pure, c/o Shiva, Hannah, and Vikhyat (the "March 1 Letter"). In the March 1 Letter, CCTC advised that Capital Pure was in breach of the JVA, for its failure to deliver the SBLC or any of the funding it was required to deliver thereunder. CCTC also requested immediate proof that the escrow deposit of $336,000 was still being held in the escrow account designated by the parties and demanded that the escrow funds "be returned forthwith without delay or setoff."

47. Chrisman opened the e-mail containing the letter, and the letter was also delivered to Chrisman's house by Certified Mail as it was declined at other addresses associated with Chrisman. Chrisman did not respond to the letter, nor did he take any action demanded in the letter or required to be taken under the Escrow Agreement, upon receipt of a demand from one of

the parties to release the escrow deposit. Capital Pure, on the other hand, requested a videoconference on March 5, to discuss the March 1 Letter.

48. On March 5, 2024, the parties held a videoconference (the "March 5 Videoconference"), which was attended by Shiva, Mr. Gavin, Mr. Lang, and Mr. Terry Patton, the Chairman of CCTC's Board of Directors. The parties recorded the March 5 Videoconference, based on their agreement to do so.

49. During the March 5 Videoconference, when CCTC's representatives asked if Chrisman would be joining the call, Shiva advised that Chrisman would not be participating and that he would only speak to them if they came to Las Vegas.

50. When asked at the March 5 Videoconference why Capital Pure had not delivered funding or obtained the SBLC, Shiva concocted a completely new story as to why no funds were delivered to CCTC. Shiva stated, for the first time, that Capital Pure tried to send the funds to CCTC, but that CCTC's bank did not have the capacity to receive the funds. Shiva stated that he only needed an e-mail from an officer at CCTC's bank advising that the transaction would be permitted, and that the funds would then be delivered. Shiva promised that he was willing to send even more money than the parties initially agreed to, and that the individuals on the call would not need to work for the rest of their lives. Shiva stated that the transaction would be complete within a month's time.

51. Once again relying on Shiva's promises to send funds immediately, CCTC gave Capital Pure one last chance to follow through on its promises and comply with the JVA.

52. On March 7, 2024, CCTC sent another e-mail to Chrisman, asking for (i) confirmation that the escrow funds were still in the account designated in the JVA and the Escrow Agreement, (ii) if they were, documentation to show that the funds had never been taken out of the escrow account, and (iii) if the funds were not still in the account, all documentation relating to the escrow agent's movement of the funds.

53. Upon information and belief, Chrisman opened the e-mail, but again, he never responded.

54. Instead, and without any effort on the part of Capital Pure to deliver any funds or

24

the SBLC, on March 27, 2024, Shiva sent CCTC an email in which he copied Chrisman and stated the following:

> Here are the documents that are needed to process
> 1. Rescind the farce demand letter
> 2. Execute the attached Escrow release

55.     Shiva attached to this e-mail a document titled "Mutual Release for Escrow" (hereinafter, the "Escrow Release").  The Escrow Release purported to state the terms under which Chrisman would release the escrow funds to CCTC.  They included lengthy and complete releases of liability between the parties and indemnity provisions for the benefit of Chrisman, P.C. and Chrisman, which were never before discussed or agreed to by the parties.  The Escrow Release further provided, without explanation, that CCTC would only receive a total of $324,240 from the escrow funds, rather than the full amount of $336,000.

56.     Upon information and belief, Counter-defendants have worked together to avoid returning the escrow funds to CCTC, as required under the Escrow Agreement.

57.     Based on Counter-defendants' attempts to get CCTC to sign a release and still failing to comply with any of their contractual and other obligations, on or about March 28, 2024, CCTC's counsel sent a "Final Demand for Payment of Amounts Owed to CC Technology Corporation" (hereinafter, the "March 28 Demand").  In the March 28 Demand, CCTC's counsel advised of the impropriety of the Escrow Release that was presented to CCTC, and also listed the various failures of the Counter-defendants under the JVA and the Escrow Agreement.

58.     The March 28 Demand offered a final opportunity for the Counter-defendants to discuss and potentially resolve their issues with CCTC, before CCTC would be forced to initiate litigation regarding this matter.

59.     In an attempt at what can only be explained as trying to intimidate CCTC into waiving its rights, Capital Pure filed a completely meritless lawsuit, based on lies about the dealings between the parties.

60.     On or about the same day Capital Pure filed its Complaint in this case, Capital Pure's counsel advised that "Capital Pure Assets will instruct the Escrow that it does not object to the release of the escrow funds and that they should be returned to the source account from which

they were sent." Not surprisingly, after CCTC's counsel followed up to see when the escrow funds would be returned after several days, Capital Pure's attorneys advised that Capital Pure "has reconsidered its position on the escrow and objects to the escrow amount being returned." CCTC still has not received the escrow funds, or any portion thereof, from any of the Counter-defendants.

61. CCTC now responds to the meritless allegations in Capital Pure's Complaint, and files this Counterclaim to pursue all rights and remedies available to it as a result of the Counter-defendants' conduct.

**FIRST CLAIM FOR RELIEF**

**(Alter Ego Liability)**

62. CCTC repeats, realleges, and incorporates by this reference each and all of the allegations contained in Paragraphs 1 through 61 of this Counterclaim, as if fully set forth herein.

63. CCTC is informed and believes, and thereon alleges, that Capital Pure is completely controlled, dominated, managed, and operated by Shiva and Hannah, since its formation and up to the present, for their own personal benefit such that Capital Pure is merely a shell, instrumentality, and conduit through which Shiva and Hannah carried on a scheme to defraud third parties, including CCTC.

64. CCTC is informed and believes, and thereon alleges, that there now exists, and at all times herein relevant has existed, a unity of interest and ownership between Shiva and Hannah, on the one hand, and Capital Pure, on the other hand, such that any individual or separateness of Capital Pure and its individual owners has ceased or was never recognized.

65. Capital Pure is, and at all times herein relevant was, so inadequately capitalized that, compared with the business to be conducted and the risks of loss attendant thereto, its capitalization was illusory.

66. Shiva and Hannah have exercised, and continue to exercise, full control and dominance over Capital Pure.

67. Shiva and Hannah completely disregard the corporate identity of Capital Pure as a separate entity and treat the company as an extension of themselves.

68. Shiva and Hannah have commingled their personal funds with those of Capital

Pure. Shiva and Hannah have so intermingled their financial affairs with Capital Pure, and there exists among them such a unity of interest and ownership, that any individuality and separateness should be disregarded, and Shiva and Hannah should be considered the alter egos of Capital Pure.

69. Based on the foregoing, adherence to the fiction of the separate existence of Shiva and Hannah, on the one hand, and Capital Pure, on the other hand, as individuals and entities distinct and separate from each other would permit abuse of the corporate form and would sanction a fraud and injustice upon the parties and the Court, such that, in equity and good conscience, the corporate form should be disregarded.

## SECOND CLAIM FOR RELIEF

### (Fraud – against Capital Pure, Shiva, Hannah, and Vikhyat)

70. CCTC repeats, realleges, and incorporates by this reference each and all of the allegations contained in Paragraphs 1 through 69 of this Counterclaim, as if fully set forth herein.

71. Shiva, Hannah, and Vikhyat made a series of false representations to induce CCTC into entering into the JVA, and the overall venture between the parties. These false representations include, but are not limited to: (i) advising Mr. Gavin and Mr. Lang that Capital Pure has a proven track record of success in various industries and that it can freely draw upon funds from its clients' family offices; and (ii) advising Mr. Gavin and Mr. Lang that Capital Pure can obtain an SBLC in the amount of $50 million, and also deliver funds in the amount of $20 million.

72. Shiva, Hannah, and Vikhyat also made a series of false representations to CCTC, to enable Counter-defendants to continue their use and misappropriation of the escrow funds, and to lull CCTC into inaction, including, but not limited to: (i) promising that funds would be distributed on September 15, 2023; (ii) advising that the MT799 Pre-Advice message had already been obtained and that Capital Pure was in the process of obtaining the SBLC; (iii) advising CCTC and its investors that the funding would be delivered by February 1, 2024; and (iv) once again promising the funds would be delivered during the March 5 Videoconference.

73. Shiva, Hannah, and Vikhyat knew that these statements were false when made or had knowledge that they had an insufficient basis for making these statements and representations to CCTC.

74.    By making these statements, Shiva, Hannah, and Vikhyat intended to induce CCTC into entering into its venture with Capital Pure, including by entering into the JVA and the Escrow Agreement.  Shiva, Hannah, and Vikhyat also made the statements referenced above for the purpose of lulling CCTC into inaction and continuing to enrich themselves with CCTC's funds.

75.    CCTC justifiably relied upon Shiva's, Hannah's, and Vikhyat's misrepresentations.

76.    As a direct and proximate result of Shiva's, Hannah's, and Vikhyat's fraudulent conduct in this regard, CCTC has suffered damages in excess of $75,000, in an amount to be determined at trial.

77.    In performing the wrongful acts and omissions alleged above, Shiva, Hannah, and VIkhyat acted in bad faith, in a knowing, willful, malicious, oppressive and/or fraudulent manner, and with the intent and purpose of advancing their own gain at the expense of CCTC.  CCTC is therefore entitled to punitive and exemplary damages against Shiva, Hannah, and Vikhyat, in a sum to be determined at the time of trial.

78.    CCTC has been forced to retain the services of an attorney to prosecute this matter and is entitled to recover its reasonable attorneys' fees and costs pursuant to Nevada law.

### THIRD CLAIM FOR RELIEF

**(Deceptive Trade Practices/Consumer Fraud – against Capital Pure, Shiva, and Hannah)**

79.    CCTC repeats, realleges, and incorporates by this reference each and all of the allegations contained in Paragraphs 1 through 78 of this Counterclaim, as if fully set forth herein.

80.    Under NRS 598.0915, "[a] person engages in a 'deceptive trade practice' if, in the course of his or her business or occupation, he or she . . . [k]nowingly makes [a] false representation in a transaction."

81.    As established by the Paragraphs above, Capital Pure made a variety of false representations in connection with the transaction contemplated by the parties.

82.    Accordingly, Capital Pure engaged in consumer fraud under NRS 41.600(2)(e), and deceptive trade practices under NRS 598.0915(15).

83.    As a direct and proximate result of Capital Pure's conduct in this regard, CCTC has suffered damages in excess of $75,000, in an amount to be determined at trial.

84. Under NRS 598.0999(3), CCTC is entitled to disgorgement of all of the profits derived from Capital Pure's knowing and willful engagement in a deceptive trade practice, as well as treble damages on all damages suffered by CCTC in connection with the same.

85. Under NRS 41.600(3), CCTC is further entitled to recover its reasonable attorneys' fees and costs incurred in connection with this matter, as well as any equitable relief that the Court deems appropriate, including, but not limited to, injunctive relief necessary to secure, account for, and return the escrow funds to CCTC.

86. As established in the foregoing paragraphs, Shiva and Hannah are the alter egos of Capital Pure, and they are therefore jointly and severally liable for the conduct of Capital Pure, as alleged herein.

## FOURTH CLAIM FOR RELIEF

### (Breach of Contract – against Capital Pure, Shiva, and Hannah)

87. CCTC repeats, realleges, and incorporates by this reference each and all of the allegations contained in Paragraphs 1 through 86 of this Counterclaim, as if fully set forth herein.

88. The JVA is a valid and binding contract between CCTC and Capital Pure.

89. The Escrow Agreement is a valid and binding contract between CCTC and Capital Pure.

90. CCTC has performed all conditions, obligations, and covenants required under the JVA and the Escrow Agreement, or has been excused from performing such conditions, obligations, and covenants.

91. Capital Pure breached the JVA, by: (i) failing to instruct its bank to start the SBLC process; (ii) failing to instruct its bank to send a MT799 Pre-Advice message to the monetizer's bank; and (iii) failing to instruct its bank to send the SBLC via MT760 directly to the Monetizer's Bank.

92. Capital Pure breached the Escrow Agreement, by working with Chrisman to avoid the release of the escrow funds as required by the Escrow Agreement and the escrow holder's fiduciary duties to CCTC.

93. As a direct and proximate result of Capital Pure's breach of the JVA and the Escrow

Agreement, respectively, CCTC has suffered damages in excess of $75,000, in an amount to be determined at trial.  This includes, without limitation, all consequential and incidental damages suffered by CCTC as a result of Capital Pure's breach of the JVA and the Escrow Agreement.

94.    CCTC has been forced to retain the services of an attorney to prosecute this matter and is entitled to recover its reasonable attorneys' fees and costs pursuant to Nevada law.

95.    As established in the foregoing paragraphs, Shiva and Hannah are the alter egos of Capital Pure, and they are therefore jointly and severally liable for the conduct of Capital Pure, as alleged herein.

## FIFTH CLAIM FOR RELIEF

### (Breach of the Implied Covenant of Good Faith and Fair Dealing – against Capital Pure, Shiva, and Hannah)

96.    CCTC repeats, realleges, and incorporates by this reference each and all of the allegations contained in Paragraphs 1 through 95 of this Counterclaim, as if fully set forth herein.

97.    In Nevada, every agreement contains an implied covenant of good faith and fair dealing.

98.    The JVA and the Escrow Agreement contain an implied covenant of good faith and fair dealing.

99.    Capital Pure owed CCTC a duty to act in good faith and a duty of fair dealing. Through its actions established in the preceding Paragraphs, Capital Pure violated and breached its duties of good faith and fair dealing to CCTC.

100.    As a direct and proximate result of Capital Pure's breach of the implied covenant of good faith and fair dealing, CCTC has suffered damages in excess of $75,000, in an amount to be determined at trial.  This includes, without limitation, all consequential and incidental damages suffered by CCTC as a result of Capital Pure's breach of the implied covenant of good faith and fair dealing.

101.    CCTC has been forced to retain the services of an attorney to prosecute this matter and is entitled to recover its reasonable attorneys' fees and costs pursuant to Nevada law.

102.    As established in the foregoing paragraphs, Shiva and Hannah are the alter egos of

30

Capital Pure, and they are therefore jointly and severally liable for the conduct of Capital Pure, as alleged herein.

### SIXTH CLAIM FOR RELIEF

#### (Breach of Contract – against Chrisman, P.C.)

103. CCTC repeats, realleges, and incorporates by this reference each and all of the allegations contained in Paragraphs 1 through 102 of this Counterclaim, as if fully set forth herein.

104. The Escrow Agreement is a valid and binding contract between CCTC and Chrisman, P.C.

105. CCTC has performed all conditions, obligations, and covenants required under the Escrow Agreement, or has been excused from performing such conditions, obligations, and covenants.

106. Chrisman, P.C. has breached the Escrow Agreement, by: (i) failing to notify CCTC and Capital Pure that a demand for the return of escrow funds has been made and any objection to the release of those funds must be made within thirty (30) business days; and (ii) failing to return the escrow funds to CCTC after a demand was made and no objection was made by Capital Pure.

107. As a direct and proximate result of Chrisman's breach of the Escrow Agreement, CCTC has suffered damages in excess of $75,000, in an amount to be determined at trial. This includes, without limitation, all consequential and incidental damages suffered by CCTC as a result of Chrisman, P.C.'s breach of the Escrow Agreement.

108. CCTC has been forced to retain the services of an attorney to prosecute this matter and is entitled to recover its reasonable attorneys' fees and costs pursuant to Nevada law.

### SEVENTH CLAIM FOR RELIEF

#### (Breach of the Implied Covenant of Good Faith and Fair Dealing – against Chrisman, P.C.)

109. CCTC repeats, realleges, and incorporates by this reference each and all of the allegations contained in Paragraphs 1 through 108 of this Counterclaim, as if fully set forth herein.

110. In Nevada, every agreement contains an implied covenant of good faith and fair dealing.

111. The Escrow Agreement contains an implied covenant of good faith and fair dealing.

112.    Chrisman, P.C. owed CCTC a duty to act in good faith and a duty of fair dealing. Through its actions established in the preceding Paragraphs, Chrisman, P.C. violated and breached its duties of good faith and fair dealing to CCTC.

113.    As a direct and proximate result of Chrisman P.C.'s breach of the implied covenant of good faith and fair dealing, CCTC has suffered damages in excess of $75,000, in an amount to be determined at trial.  This includes, without limitation, all consequential and incidental damages suffered by CCTC as a result of Chrisman, P.C.'s breach of the implied covenant of good faith and fair dealing.

114.    CCTC has been forced to retain the services of an attorney to prosecute this matter and is entitled to recover its reasonable attorneys' fees and costs pursuant to Nevada law.

### EIGHTH CLAIM FOR RELIEF

**(Breach of Fiduciary Duties – against Chrisman and Chrisman, P.C.)**

115.    CCTC repeats, realleges, and incorporates by this reference each and all of the allegations contained in Paragraphs 1 through 114 of this Counterclaim, as if fully set forth herein.

116.    In connection with the Escrow Agreement, Chrisman and Chrisman, P.C. owed CCTC fiduciary duties, including the duty of honest and the duty of loyalty.

117.    Chrisman and Chrisman, P.C. violated these fiduciary duties, by: (i) failing or refusing to return the funds deposited into escrow by CCTC, in accordance with the terms of the Escrow Agreement; and (ii) failing or refusing to respond to CCTC's requests for information about the status of the escrow funds.

118.    As a direct and proximate result of Chrisman's and Chrisman, P.C.'s breach of their fiduciary duties, CCTC has suffered damages in excess of $75,000, in an amount to be determined at trial.

119.    In performing the wrongful acts and omissions alleged above, Chrisman and Chrisman, P.C. acted in bad faith, in a knowing, willful, malicious, oppressive and/or fraudulent manner, and with the intent and purpose of advancing their own gain at the expense of CCTC. CCTC is therefore entitled to punitive and exemplary damages against Chrisman and Chrisman, P.C., in a sum to be determined at the time of trial.

32

120.    CCTC has been forced to retain the services of an attorney to prosecute this matter and is entitled to recover its reasonable attorneys' fees and costs pursuant to Nevada law.

### NINTH CLAIM FOR RELIEF

**(Civil Conspiracy – against all Counter-defendants)**

121.    CCTC repeats, realleges, and incorporates by this reference each and all of the allegations contained in Paragraphs 1 through 120 of this Counterclaim, as if fully set forth herein.

122.    Through their actions established in the Paragraphs above, Counter-defendants acted in concert with the intent to accomplish an unlawful objective for the purpose of harming CCTC.  In particular, Counter-defendants agreed to participate and participated in a scheme to deprive CCTC of the funds it deposited into escrow, for the purpose of enriching themselves.

123.    As a direct and proximate result of this civil conspiracy carried out by Counter-defendants, CCTC has suffered damages in excess of $75,000, in an amount to be determined at trial.

124.    In performing the wrongful acts and omissions alleged above, Counter-defendants acted in bad faith, in a knowing, willful, malicious, oppressive and/or fraudulent manner, and with the intent and purpose of advancing their own gain at the expense of CCTC.  CCTC is therefore entitled to punitive and exemplary damages against the Counter-defendants, in a sum to be determined at the time of trial.

125.    CCTC has been forced to retain the services of an attorney to prosecute this matter and is entitled to recover its reasonable attorneys' fees and costs pursuant to Nevada law.

### TENTH CLAIM FOR RELIEF

**(Conversion – against all Counter-defendants)**

126.    CCTC repeats, realleges, and incorporates by this reference each and all of the allegations contained in Paragraphs 1 through 125 of this Counterclaim, as if fully set forth herein.

127.    CCTC is entitled to the return of its escrow deposit based on Counter-defendants failures and/or misconduct, as referenced above.

128.    As established by the allegations in this Counterclaim, Counter-defendants, through their wrongful conduct have converted, for their own personal use and benefit, the escrow funds

33

that CCTC is entitled to receive.

129.    Counter-defendants' exercise of dominion over and/or use of those funds has deprived CCTC of its lawful enjoyment and use of the escrow funds it deposited.  In good conscience and equity, Counter-defendants should not be permitted to retain those funds that rightfully belong to CCTC.

130.    As a direct and proximate result of Counter-defendants' conversion of CCTC's funds, CCTC has suffered damages in excess of $75,000, in an amount to be determined at trial.

131.    As a direct and proximate result of Defendants' wrongful conduct, this Court should impose a constructive trust on each of the Counter-defendants, requiring them to disgorge and make restitution to CCTC for the wrongfully retained funds, or any other benefit derived therefrom.

132.    In performing the wrongful acts and omissions alleged above, Counter-defendants acted in bad faith, in a knowing, willful, malicious, oppressive and/or fraudulent manner, and with the intent and purpose of advancing their own gain at the expense of CCTC.  CCTC is therefore entitled to punitive and exemplary damages against the Counter-defendants, in a sum to be determined at the time of trial.

133.    CCTC has been forced to retain the services of an attorney to prosecute this matter and is entitled to recover its reasonable attorneys' fees and costs pursuant to Nevada law.

### ELEVENTH CLAIM FOR RELIEF

**(Unjust Enrichment – in the Alternative – against all Counter-defendants)**

134.    CCTC repeats, realleges, and incorporates by this reference each and all of the allegations contained in Paragraphs 1 through 133 of this Counterclaim, as if fully set forth herein.

135.    Counter-defendants received and have appreciated the benefit of CCTC's escrow deposit, which was required to be returned to CCTC.

136.    Counter-defendants accepted and retained such benefit under such circumstances that it would be inequitable for them to retain the benefit without providing CCTC with the value thereof.

137.    Accordingly, Counter-defendants have been unjustly enriched in an amount in

excess of $75,000.

138.    As a direct and proximate result of this conduct by Counter-defendants, CCTC has suffered damages in excess of $75,000, in an amount to be determined at trial.

139.    CCTC has been forced to retain the services of an attorney to prosecute this matter and is entitled to recover its reasonable attorneys' fees and costs pursuant to Nevada law.

### TWELFTH CLAIM FOR RELIEF

**(Declaratory Relief – against all Counter-defendants)**

140.    CCTC repeats, realleges, and incorporates by this reference each and all of the allegations contained in Paragraphs 1 through 139 of this Counterclaim, as if fully set forth herein.

141.    Under NRS 30.030, "[a]ny person . . . whose rights, status or other legal relations are affected by a statute, municipal ordinance, contract or franchise, may have determined any question of construction or validity arising under the instrument, statute, ordinance, contract or franchise and obtain a declaration of rights, status or other legal relations thereunder."

142.    A justiciable controversy exists between CCTC, on the one hand, and Capital Pure and Chrisman, P.C., on the other hand, regarding their respective rights and obligations under the Escrow Agreement.

143.    CCTC and such Counter-defendants have adverse interests regarding this controversy, which is ripe for judicial determination because harm is likely to occur, or has already occurred, absent the Court's adjudication of the parties' rights.

144.    CCTC has a legal and protectible interest in this controversy.

145.    CCTC is entitled to a declaration that it is entitled to the return of the funds it deposited into escrow.

146.    CCTC is entitled to injunctive relief requiring Chrisman, P.C., or any other Counter-defendants who may have possession of the subject funds, to return the funds that CCTC deposited into escrow.

147.    CCTC has been forced to retain the services of an attorney to prosecute this matter and is entitled to recover its reasonable attorneys' fees and costs pursuant to Nevada law. This includes, without limitation, CCTC's right to recover its reasonable attorneys' fees and costs as

special damages, because such attorneys' fees and costs were incurred as foreseeable damages arising from Counter-defendants' bad faith conduct.

## **PRAYER FOR RELIEF**

WHEREFORE, CCTC prays for the following relief against the Counter-defendants, jointly and severally, as follows:

1. An award of CCTC's compensatory, general, incidental, and consequential damages in an amount in excess of $75,000;

2. An award of punitive damages;

3. An award of statutory and treble damages under NRS 598.0999;

4. An award of reasonable attorneys' fees and costs incurred in connection with this matter, including, but not limited to, an award of statutory attorneys' fees and costs incurred under NRS 41.600, and an award of attorneys' fees and costs as special damages arising from Counter-defendants' bad faith conduct;

5. An award of prejudgment and post-judgment interest on all such amounts;

6. That the Court enter declaratory relief, as requested herein;

7. That the Court enter equitable relief, including injunctive relief, as requested herein; and

8. That the Court enter such other and further relief as it deems necessary and appropriate.

Dated this 17th day of June, 2024.

SKLAR WILLIAMS PLLC

*/s/ David B. Barney*_____
Stephen R. Hackett, Esq.
Nevada Bar No. 5010
David B. Barney, Esq.
Nevada Bar No. 14681
410 South Rampart Blvd, Suite 350
Las Vegas, NV 89145
*Attorneys for Defendant/Counterclaimant*
*CC Technology Corporation*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 17th day of June, 2024, a true and correct copy of the foregoing **DEFENDANT/COUNTERCLAIMANT CC TECHNOLOGY CORPORATION'S ANSWER AND COUNTERCLAIM** was filed electronically with the Clerk of the Court by submission to the electronic filing and service system (CM/ECF) at the United States District Court, District of Nevada.  CM/ECF will provide copies to all parties and counsel of record registered to receive CM/ECF notification.

*/s/ David B. Barney*_____
An employee of Sklar Williams PLLC
