# EXHIBIT A

Declaration of Thomas Gavin

Stephen R. Hackett, Esq.
Nevada Bar No.: 5010
David B. Barney, Esq.
Nevada Bar No.: 14681
SKLAR WILLIAMS PLLC
410 South Rampart Boulevard, Suite 350
Las Vegas, Nevada 89145
Telephone: (702) 360-6000
Facsimile: (702) 360-0000
Email: shackett@sklar-law.com
         dbarney@sklar-law.com
*Attorneys for Defendant/Counterclaimant*
*CC Technology Corporation*

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| CAPITAL PURE ASSETS, LTD, a Nevada limited liability company, <br><br> Plaintiff, <br><br> v. <br><br> CC TECHNOLOGY CORPORATION, a Colorado corporation; DOES 1 through 10, inclusive; and ROE CORPORATIONS 1 through 10, inclusive, <br><br> Defendants. | Case No. 2:24-cv-00680-RFB-NJK <br><br> **DECLARATION OF THOMAS GAVIN IN SUPPORT OF DEFENDANT/ COUNTERCLAIMANT CC TECHNOLOGY CORPORATION'S MOTION FOR PRELIMINARY INJUNCTION OR, IN THE ALTERNATIVE, TO COMPEL DEPOSIT OF ESCROW FUNDS WITH THE COURT** |
| CC TECHNOLOGY CORPORATION, a Colorado corporation, <br><br> Counterclaimant, <br><br> v. <br><br> CAPITAL PURE ASSETS, LTD, a Nevada limited liability company; SHIVA PRAKASH, an individual; HANNAH DAWN PRAKASH, an individual; VIKHYAT PRAKASH, an individual; JAMES CHRISMAN, P.C., a Nevada professional corporation; JAMES P. CHRISMAN, an individual; DOES 1 through 10, inclusive; and ROE ENTITIES I through X, inclusive, <br><br> Counter-defendants. | |

1

I, THOMAS GAVIN, declare as follows:

1.      I am a member of the Board of Directors of Cannatrac Financial Corp. and an advisor to CC Technology Corporation ("CCTC"), the Defendant and Counterclaimant in this lawsuit. I was also the company's Chief Executive Officer from December 2018, until May 31, 2024.

2.      I make this Declaration in support of CCTC's Motion for Preliminary Injunction or, in the Alternative, to Compel Deposit of Escrow Funds with the Court (hereinafter, the "Motion"). I have personal knowledge of the facts set forth herein, except for those made and based upon information and belief, and as to those matters, I believe them to be true. If called upon to testify to the matters set forth in this Declaration, I could and would competently do so.

3.      CCTC is a subsidiary of Cannatrac Financial Corp. ("Cannatrac"), a company based in Canada. CCTC provides technology consulting services and serves as the distributor of the "CannaCard," a project that Cannatrac, through its subsidiaries, has been working to develop and market for years. CannaCard is a cashless payment and rewards system that can be used in the cannabis industry.

4.      In early May 2023, a mutual acquaintance introduced CCTC to Capital Pure Assets, LTD ("Capital Pure"). The individual who introduced us advised CCTC that Capital Pure may be able to secure funding for some of CCTC's projects, including CannaCard. *Id.* Based on initial conversations between CCTC and Capital Pure's representatives, CCTC's then advisor to its Board of Directors, Robert Lang, and I traveled to Las Vegas to meet with Capital Pure and discuss a potential business arrangement between CCTC, on the one hand, and Capital Pure, on the other hand.

5.      On May 23, 2023, Mr. Lang and I met with Capital Pure's Chairman, Shiva Prakash ("Shiva"), and his son, Vikhyat Prakash ("Vikhyat"), who holds himself out as Capital Pure's Vice President of Business Development. During the meeting, Shiva and Vikhyat told us about Capital Pure's extensive experience and success working with businesses in a variety of industries, including technology, defense, aerospace, and hospitality. They also promised us that they could draw upon tens of millions of dollars of funding instantly, from their clients' family offices in

India.

6. Approximately one week after our initial meeting with Capital Pure, Mr. Lang and I returned to Las Vegas and held another meeting with Shiva and Vikhyat. During the second meeting, we once again discussed the prospect of entering into a business relationship, and Shiva and Vikhyat continued telling us about Capital Pure's success and funding abilities. In reliance on those representations, we agreed for CCTC to enter into a joint venture with Capital Pure in which Capital Pure would provide millions of dollars of funding to CCTC for CCTC's use in connection with its projects, including CannaCard, and the parties would split the profits of those projects. CCTC and Capital Pure entered into a Joint Venture Agreement on or about June 26, 2023 (the "JVA"), which set forth the terms of this joint venture. A true and correct copy of the JVA is attached to the Motion as **Exhibit B**.

7. Because the JVA contemplated funds being deposited into an escrow account, CCTC and Capital Pure also entered into an "Escrow Agreement" on or about July 5, 2023. A true and correct copy of the Escrow Agreement is attached to the Motion as **Exhibit C**.

8. In accordance with the terms of the JVA and the Escrow Agreement, on or about July 7, 2023, CCTC deposited into the escrow account designated by Capital Pure and Chrisman, P.C. the amount of $336,000. A true and correct copy of the wire transfer record for such deposit is attached to the Motion as **Exhibit D**.

9. From July to August of 2023, I followed up with Capital Pure regarding the progress of the funding required to be delivered under the JVA. After a series of phone calls in which Capital Pure assured me that the funding was in process, I advised Capital Pure that I was concerned about the lack of movement on Capital Pure's side under the JVA and requested written confirmation that at least the funds Capital Pure agreed to deliver would be released to CCTC soon. On August 23, 2023, in response to my request, Vikhyat e-mailed stating that Capital Pure was "in a position to get the funding to CannaCard." A true and correct copy of such correspondence is attached to the Motion as **Exhibit E**.

10. On September 21, 2023, after no funds had been distributed and there was no movement on the part of Capital Pure to comply with its obligations under the JVA, I sent Capital

3

Pure an email requesting the return of the escrow funds deposited by CCTC. A true and correct copy of such e-mail correspondence is attached to the Motion as **Exhibit F**. In the message, I explained that while CCTC was open to discussing the parties' entry into a new joint venture, CCTC needed the initial escrow deposit of $336,000 to be returned, due to demands from the lender who initially lent those funds to CCTC, with interest continuing to accrue—a fact that Capital Pure and Chrisman were aware of at the time we entered into these transactions. Just hours after I sent this email to Capital Pure, Shiva responded by stating, "[w]e will process the termination of the escrow agreement signed by all parties, along with a termination of the JV agreement." But once again, Capital Pure and its personnel failed to deliver as promised.

11. After several days had gone by and CCTC had not received a refund of the escrow deposit, I followed up with Shiva once again, to which Shiva responded by giving me a time to speak over the phone. On September 29, 2023, Shiva and I held a telephone conference during which Shiva told me that the MT799 had already been processed, and that the funding was therefore on its way. In reliance on that communication, which I now believe was completely a lie, CCTC agreed to stay in the transaction rather than pull its escrow deposit and potentially enter into a new agreement with Capital Pure thereafter. A true and correct copy of my correspondence to this effect is attached to the Motion as **Exhibit G**.

12. I had several more calls and an additional in-person meeting with Capital Pure after the September 29 phone call, in which Shiva and Vikhyat continued to promise that the funding was on its way. In November of 2023, however, when CCTC **still** had not received any movement as far as the funding of $20 million or the SBLC being issued, CCTC stressed to Capital Pure the importance of giving some proof to CCTC's investors to show that the funding would be delivered soon. On or about December 6, 2023, Shiva sent a letter to me on Capital Pure letterhead, in which Capital Pure represented to CCTC and its investors—once again—that the funding was on its way. A true and correct copy of such correspondence is attached to the Motion as **Exhibit H**.

13. February 1 came and went, and notwithstanding Capital Pure's continued promises to deliver funds, neither funds nor the SBLC ever came. I then made further demands throughout February, for Capital Pure to comply with its obligations under the JVA, but Capital Pure

4

continued to do nothing. Without another option and facing increasing pressure from the lender of the $336,000, which continued to accrue interest, as well as CCTC's investors, CCTC sent a demand letter to Capital Pure and Counter-defendant James Chrisman ("Chrisman"), in his capacity as the escrow agent and the principal of Chrisman, P.C., demanding that the parties resolve the issues between them and that the escrow funds be returned to CCTC immediately. A true and correct copy of this demand letter is attached to the Motion as **Exhibit I**.

14.     The demand letter was sent to Chrisman by e-mail and Certified Mail. Upon information and belief, Chrisman received and opened the demand letter electronically, and he also received a hard copy that was delivered to his home. A true and correct copy of the return receipt for the demand letter is attached to the Motion as **Exhibit J**. Chrisman never responded to the letter, however, nor did he provide notice to the parties of CCTC's demand for the return of the escrow funds, as required under the Escrow Agreement.

15.     Based on this non-response, I sent a follow-up email to Chrisman, asking for (i) confirmation that the escrow funds were still in the account designated in the JVA and the Escrow Agreement, (ii) if they were, documentation to show that the funds had never been taken out of the escrow account, and (iii) if the funds were not still in the account, all documentation relating to the escrow agent's movement of the funds. A true and correct copy of such e-mail correspondence is attached to the Motion as **Exhibit K**. Based on "Mailtrack" notifications on my Gmail account, I am informed and believe that Chrisman opened this e-mail, but once again, he never responded.

16.     CCTC, did, however, have a videoconference with Shiva on March 5, 2024, based on Shiva's request in response to CCTC demand letter. I was present during the videoconference, along with Mr. Lang and Terry Patton, the founder of CCTC and the Chairman of its Board, on CCTC's side. During the videoconference, Shiva first advised that Chrisman would not be participating in the call and that he would not speak to CCTC unless the company's representatives were physically present in Las Vegas. Shiva also stated, for the first time, that Capital Pure tried sending the funds at issue to CCTC, but that they were denied because CCTC's bank did not have the capacity to receive the funds. Shiva told CCTC that if the company had its bank write a letter

advising that it would accept the funds, the funds would be delivered. Shiva also told us that he was willing to send even more money than the parties initially agreed to, and that we would not need to work for the rest of our lives. Shiva promised that the funds would be delivered within a month's time.

17. After the March 5 videoconference, CCTC never received any funds from Capital Pure, nor any instructions on how its bank should get in touch with Capital Pure's bank to resolve any issues that Shiva was talking about. Accordingly, on March 26, 2024, I e-mailed Shiva to state that there were only a few days left until the end of the month, and CCTC had not received any update on its demand, nor did it receive a refund of its escrow deposit. In response to my email, on March 27, 2024, Shiva sent me an e-mail in which he stated that if CCTC rescinded its demand letter and executed the attached escrow release agreement, the refund would be processed. Shiva attached a document titled Mutual Release for Escrow (hereinafter, the "Escrow Release"), which stated that upon its execution, the escrow funds would be returned to CCTC. A true and correct copy of this email correspondence is attached to the Motion as **Exhibit L**.

18. Notwithstanding CCTC's numerous demands for the return of the escrow funds deposited with Capital Pure and Chrisman, CCTC has not received any portion of the escrow funds back, nor has it ever received any documentation or other proof that the escrow funds are still in the bank account designated by the parties. Based on the correspondence referenced above, the unfulfilled promises to return the escrow funds, and Chrisman's silence, I am informed and believe that the Counter-defendants in this case have moved or converted the escrow funds for their own use, and that without injunctive relief preventing them from further doing so or depositing those funds with the Court, the escrow funds—which may be the only funds available for CCTC to recover—will disappear by the time a final judgment is entered in this lawsuit leaving CCTC with no way to be made whole.

I declare under penalty of perjury that the foregoing is true and correct.

Dated July 31st, 2024.

_____
THOMAS GAVIN

6

7