Stephen R. Hackett, Esq.
Nevada Bar No.: 5010
David B. Barney, Esq.
Nevada Bar No.: 14681
SKLAR WILLIAMS PLLC
410 South Rampart Boulevard, Suite 350
Las Vegas, Nevada 89145
Telephone: (702) 360-6000
Facsimile:  (702) 360-0000
Email: shackett@sklar-law.com
        dbarney@sklar-law.com
*Attorneys for Defendant/Counterclaimant*
*CC Technology Corporation*

# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

| | |
|---|---|
| CAPITAL PURE ASSETS, LTD, a Nevada limited liability company,<br><br>Plaintiff,<br><br>v.<br><br>CC TECHNOLOGY CORPORATION, a Colorado corporation; DOES 1 through 10, inclusive; and ROE CORPORATIONS 1 through 10, inclusive,<br><br>Defendants. | Case No. 2:24-cv-00680-RFB-NJK<br><br>**DEFENDANT/COUNTERCLAIMANT CC TECHNOLOGY CORPORATION'S MOTION FOR PRELIMINARY INJUNCTION OR, IN THE ALTERNATIVE, TO COMPEL DEPOSIT OF ESCROW FUNDS WITH THE COURT**<br><br>**ORAL ARGUMENT REQUESTED** |
| CC TECHNOLOGY CORPORATION, a Colorado corporation,<br><br>Counterclaimant,<br><br>v.<br><br>CAPITAL PURE ASSETS, LTD, a Nevada limited liability company; SHIVA PRAKASH, an individual; HANNAH DAWN PRAKASH, an individual; VIKHYAT PRAKASH, an individual; JAMES CHRISMAN, P.C., a Nevada professional corporation; JAMES P. CHRISMAN, an individual; DOES 1 through 10, inclusive; and ROE ENTITIES I through X, inclusive,<br><br>Counter-defendants. | |

1

Defendant/Counterclaimant CC Technology Corporation ("CCTC"), by and through its attorneys, the law firm of Sklar Williams PLLC, hereby files this Motion for Preliminary Injunction requesting that the Court prevent the Counter-defendants from depleting the escrow funds at issue in this case until a final judgment is entered.

This Motion is made and based upon the following Memorandum of Points and Authorities, the exhibits attached hereto, all of the papers and pleadings on file herein, and any oral argument that the Court may allow at a hearing on this matter.

## **MEMORANDUM OF POINTS AND AUTHORITIES**

### I.    INTRODUCTION

CCTC files this motion to preserve the *status quo* and to prevent the Counter-defendants from converting the escrow funds that are supposed to still be in their possession.  Around May of 2023, Plaintiff/Counter-defendant Capital Pure Assets, LTD ("Capital Pure") defrauded CCTC, by representing that it could obtain funding of over $20 million to help CCTC scale its operations. Capital Pure advised CCTC that it would only need CCTC to pay its bank fees of $336,000, at which time it could provide funding of $20 million and also provide a Stand By Letter of Credit ("SBLC"), or a bank-issued guarantee, in the amount of $50 million for the benefit of CCTC's business.

In good faith, and in accordance with the parties' agreements, CCTC took out a loan to fund $336,000 into an escrow account that was supposed to hold the funds, so Capital Pure could provide the funding it promised.  But Capital Pure has failed to follow through with a single one of its promises, including that it would deliver the funding, or the SBLC, to CCTC.  Upon CCTC's numerous demands for the return of the escrow funds from Capital Pure and its "escrow agent," an attorney with whom Capital Pure has a close relationship, Capital Pure agreed to return the funds but then came up with a new excuse each time, taking advantage of CCTC's intent to work with Capital Pure in good faith.

In response to the last of these demands for Capital Pure to return the escrow funds, Capital Pure advised that it would only return a portion of the funds deposited, and only then if CCTC signed a release form that released Capital Pure and its agents, including the escrow agent, from

any and all misconduct, **including a failure to return the escrow deposit in the future**.  At that point, CCTC's counsel made one final demand for the return of the escrow deposit before initiating litigation.  In a last-ditch attempt to intimidate CCTC out of pursuing its rights, Capital Pure filed this sham lawsuit, seeking recovery of $40 million from CCTC, in connection with a project that has nothing to do with the agreements in this case and was never part of this transaction.

While CCTC will vigorously contest the allegations in Capital Pure's Complaint (ECF No. 1), and also pursue its own claims set forth in its Counterclaim (ECF No. 5), CCTC is concerned that the escrow deposit of $336,000 may well disappear during the pendency of this lawsuit, if it has not been converted already by Capital Pure.  Because these funds are potentially the only funds available for recovery from what appears to be a fraudulent business entity, CCTC files this Motion requesting that the Court freeze the funds and enjoin their dissipation for the duration of this litigation, by (i) requiring that Counter-defendants account for the funds and provide proof to CCTC and the Court that they are still being held in the escrow account designated by the parties, and further (ii) enjoining Counter-defendants from transferring, spending, or otherwise dissipating any of the $336,000 in escrow funds until a final judgment is entered in this case, or a Court order directing release of the funds is obtained.  In the alternative, CCTC requests that the Court compel the Counter-defendants to deposit the $336,000 in escrowed funds with the Court, to ensure its safekeeping during the pendency of this action.

## II.    FACTUAL BACKGROUND

CCTC is a subsidiary of Cannatrac Financial Corp. ("Cannatrac").  *See* Declaration of Thomas Gavin ("Gavin Decl."), attached hereto as **Exhibit A**, ¶ 3.  CCTC provides technology consulting services and serves as the distributor of the "CannaCard," a project that Cannatrac, through its subsidiaries, has been working to develop and market for years.  *Id.*  CannaCard is a cashless payment and rewards system that can be used in the cannabis industry.  *Id.*

In early May 2023, a mutual acquaintance of the parties in this case introduced CCTC to Plaintiff and Counter-defendant Capital Pure Assets, LTD ("Capital Pure").  *Id.* ¶ 4.  The parties' acquaintance advised CCTC that Capital Pure may be able to secure funding for some of CCTC's projects, including CannaCard.  *Id.*  Based on initial conversations between the parties, CCTC's

then CEO, Mr. Thomas Gavin, and advisor to its Board of Directors, Mr. Robert Lang, traveled to Las Vegas to meet with Capital Pure and discuss a potential business arrangement between CCTC, on the one hand, and Capital Pure, on the other hand. *Id.*

On May 23, 2023, Mr. Gavin and Mr. Lang met with Capital Pure's Chairman, Counter-defendant Shiva Prakash ("Shiva"), and his son, Counter-defendant Vikhyat Prakash ("Vikhyat"), who holds himself out as Capital Pure's Vice President of Business Development. *Id.* ¶ 5. During the meeting, Shiva and Vikhyat told Mr. Gavin and Mr. Lang about Capital Pure's extensive experience and success working with businesses in a variety of industries, including technology, defense, aerospace, and hospitality. *Id.* They also promised Mr. Gavin and Mr. Lang that they could draw upon tens of millions of dollars of funding instantly, from their clients' family offices in India. *Id.*

Approximately one week after the parties' initial meeting, Mr. Gavin and Mr. Lang returned to Las Vegas and held another meeting with Shiva and Vikhyat, in which Shiva and Vikhyat once again told Mr. Gavin and Mr. Lang about Capital Pure's purported success and funding abilities. *Id.* ¶ 6. In reliance on those representations, CCTC and Capital Pure agreed to enter into a joint venture, whereby Capital Pure would provide millions of dollars of funding to CCTC for CCTC's use in connection with its projects, including CannaCard, and the parties would then split the profits of those projects. *Id.* To memorialize their agreement, the parties entered into a Joint Venture Agreement on or about June 26, 2023 (the "JVA"), which set forth the terms of the joint venture. *See id.*; *see also* copy of the JVA, attached hereto as **Exhibit B**.

Section 3 of the JVA sets forth the parties' obligations with respect to the funding of the joint venture. *See* Exhibit B, at 2. The initial step is for CCTC to deposit an amount of $336,000 into an escrow account held by Capital Pure's "escrow attorney." *Id.* at 2, 14. Once the funds are deposited, Capital Pure is then required to instruct its bank to start the Standby Letter of Credit ("SBLC") process, in order for Capital Pure to obtain a SBLC in the amount of $50 million, as well as funding in the amount of $20 million, for the benefit of CCTC and the projects under the joint venture. *Id.* at 1-2. Then, Capital Pure must instruct its bank to send a MT799 Pre-Advice message to CCTC's bank. *Id.* at 2. This message essentially would confirm that the bank has the

4

funds available for the SBLC in the amount of $50 million.  *Id*.

Once the MT799 Pre-Advice message is sent, Capital Pure is then required to cause its bank to issue a MT760 message to CCTC's bank, to confirm the issuance of the SBLC in the amount of $50 million.  *Id*.  **At this time**, the escrow funds deposited by CCTC would be sent to Capital Pure's bank to pay the bank's fees associated with the issuance of the SBLC.  *Id*.  Then, Capital Pure would send funds in the amount of $20 million, in addition to the $50 million SBLC, for CCTC's use in connection with the joint venture projects.  *Id.*

Because the JVA contemplated funds being deposited into an escrow account, CCTC and Capital Pure also entered into an "Escrow Agreement" with what was supposed to be an independent, third-party escrow agent, on or about July 5, 2023.  *See* Gavin Decl. ¶ 7; *see also* copy of the Escrow Agreement, attached as **Exhibit C**.  The Escrow Agreement was signed by CCTC, Capital Pure, and Counter-defendant James Chrisman, P.C. ("Chrisman, P.C."), who was a Nevada licensed attorney and is identified in the agreement as "ESCROW."  *See* Exhibit C, at 5. The Escrow Agreement set forth the terms under which CCTC's escrow deposit would be held and maintained for the purposes of the JVA by the allegedly independent escrow agent, Chrisman, P.C. and its principal, Counter-defendant James Chrisman ("Chrisman").  *See generally id*.

Similar to the JVA, the Escrow Agreement identified the account in which the escrow funds would be held and managed by Chrisman and his entity.  *See* Exhibit B, at 14; Exhibit C, at 1, 6. In particular, "Annex 1" to the Escrow Agreement set forth the account number and routing number for the account, as well as the name of the account: "*Capital Pure Assets LLC – Treasury/Escrow*."  *Id.* at 6.  Annex 1 also identifies the attorney for the account as Chrisman and includes a copy of the inside of Chrisman's United States Passport.  *Id.*

With respect to the funds being deposited into escrow, Section 2.1 provides that "[a]ll Deposits received from JV PARTNER prior to closing, whether in the form of checks, drafts, money orders, wire transfers, or other instruments which identify the payor, shall be placed into the ESCROW Account in US Dollars."  Exhibit C, at 2.  "Any instrument payable to or endorsed other than as required [under the Escrow Agreement], and which cannot be deposited into said ESCROW Account, shall be returned to JV PARTNER and or promptly, but in no event more than

five (5) business days following receipt of such instrument by ESCROW." *Id.*

Section 3 of the Escrow Account sets forth the terms under which the escrow agent must release the funds, once deposited into the escrow account. That section provides as follows:

> 3.3  If ESCROW is not directed to release the Deposit pursuant to paragraph 3.2 above, and ESCROW receives a request by either INVESTOR or JV PARTNER, to release the Deposit, then ESCROW must give both the JV PARTNER, and INVESTOR prior written notice of not fewer than thirty (30) business days before releasing the Deposit. If ESCROW has not received notice of objection to the release of the Deposit prior to the expiration of said thirty (30) day period, the Deposit shall be released, and ESCROW shall provide further written notice to all parties JV PARTNER, and INVESTOR informing them of said release.

*See* Exhibit C, at 2.

In addition to its obligations regarding the safeguarding and release of the escrow deposit, the Escrow Agreement contains several other obligations of Chrisman, P.C. and/or Chrisman. By way of example, Section 4.1 of the Escrow Agreement provides that "ESCROW shall maintain all records concerning the ESCROW Account for two years after release of the Deposit." Exhibit C, at 3. Section 5.2 provides that a fiduciary relationship exists between "ESCROW and Investor / JV PARTNER [CCTC], and ESCROW acknowledges its fiduciary and statutory obligations." *Id.*

In reliance upon these representations and in accordance with the parties' agreements, on or about July 7, 2023, CCTC deposited into the escrow account designated by Capital Pure and Chrisman the amount of $336,000. *See* Gavin Decl., ¶ 8; *see also* wire transfer record for the deposit, attached hereto as **Exhibit D**. The wire transfer record states, as a message to the recipient, "For funding of Escrow Account on JV Agreement." Exhibit D. There is no dispute that CCTC deposited this amount into the escrow account designated by Capital Pure, Chrisman, P.C., and Chrisman, as the Counter-defendants, themselves, admit. *See* Capital Pure's Complaint (ECF No. 1; hereinafter "Complaint"), ¶ 40; ECF No. 18, ¶ 31.

From July to August of 2023, CCTC followed up with Capital Pure regarding the progress of the funding required to be delivered under the JVA. *See* Gavin Decl., ¶ 9. After a series of phone calls in which Capital Pure assured CCTC that the funding was in process, CCTC advised Capital Pure that it was concerned about the lack of movement on Capital Pure's side under the JVA and requested written confirmation that at least the funds Capital Pure agreed to deliver would

be released to CCTC soon.  *Id.*  On August 23, 2023, in response to CCTC's request, Vikhyat e-mailed Mr. Gavin, stating that Capital Pure was "in a position to get the funding to CannaCard." *Id.*; *see also* copy of such e-mail correspondence, attached as **Exhibit E**.  Vikhyat further advised that Capital Pure was "targeting the window of the week of September 15th for the distribution of funds."  Exhibit E.

On September 21, 2023, after no funds had been distributed and there was no movement on the part of Capital Pure to comply with its obligations under the JVA, Mr. Gavin sent Capital Pure an email requesting the return of the escrow funds.  *See* Gavin Decl., ¶ 10; *see also* copy of such e-mail correspondence, attached as **Exhibit F**.  Mr. Gavin explained that while CCTC was open to discussing the parties' entry into a new joint venture in the future, CCTC needed the initial escrow deposit of $336,000 due to demands from the lender who initially lent those funds to CCTC, with interest continuing to accrue.  Gavin Decl., ¶ 10; Exhibit F.  Just hours after Mr. Gavin sent his email to Capital Pure, Shiva responded: "[w]e will process the termination of the escrow agreement signed by all parties, along with a termination of the JV agreement."  Exhibit F, at 1.  But once again, Capital Pure and its personnel failed to deliver as promised.  Gavin Decl., ¶ 10.

After several days had gone by and CCTC had not received a refund of the escrow deposit, Mr. Gavin followed up with Shiva once again, to which Shiva responded by giving Mr. Gavin a time for the parties to speak over the phone.  *Id.* ¶ 11; Exhibit F, at 2.  On September 29, 2023, the parties held a telephone conference during which Shiva told Mr. Gavin the MT799 had already been processed, and that the funding was therefore on its way.  *Id.*  In reliance on that representation, which CCTC now understands was completely a lie, CCTC agreed to stay in the transaction, rather than pull its escrow deposit and potentially enter into a new agreement with Capital Pure.  *See id.*; copy of such correspondence, attached hereto as **Exhibit G**.

The parties had several calls and an in-person meeting after the September 29 phone call, in which Shiva and Vikhyat continued to promise CCTC that the funding was on its way.  *See* Gavin Decl., ¶ 12.  In November of 2023, however, when CCTC **still** had not received any movement as far as the funding of $20 million or the SBLC being issued, CCTC stressed to Capital Pure the importance of giving some proof to CCTC's investors to show that the funding would be

delivered soon.  *Id.*  On or about December 6, 2023, Shiva responded by sending a message on Capital Pure letterhead, in which Capital Pure represented to CCTC and its investors—once again—that the funding was on its way.  *Id.*; *see also* copy of such letter, attached hereto as **Exhibit H**.  In the letter, which CCTC believes was yet another complete fabrication by Capital Pure designed to allow it to keep or use the escrow funds, Shiva stated the following: "[W]e anticipate that the final monetization funding phase of your project will be concluded in the first quarter of the following year around Feb 1st week timeline."  *See* Exhibit G.

February 1 came and went, and notwithstanding Capital Pure's continued promises to deliver funds, neither funds nor the SBLC ever came.  *See* Gavin Decl., ¶ 13. CCTC made further demands throughout February, for Capital Pure to comply with its obligations under the JVA, but Capital Pure continued to do nothing.  *Id.*  Without another option and facing increasing pressure from the lender of the $336,000, which continued to accrue interest, as well as CCTC's investors, CCTC sent a demand letter to Capital Pure and Chrisman, in his capacity as the escrow agent and the principal of Chrisman, P.C., demanding that the parties resolve the issues between them and that "the escrow funds [] be returned forthwith without delay or setoff."  *See id.*; *see also* copy of CCTC's March 1, 2024 demand letter, attached hereto as **Exhibit I**, at 4.

CCTC's demand letter was sent to and opened by Chrisman via e-mail, and it was also delivered to him personally by Certified Mail.  *See* Gavin Decl., ¶ 14; *see also* copy of the Certified Mail Return Receipt, attached hereto as **Exhibit J**.  Chrisman never responded to the letter, however, nor did he provide notice to the parties of CCTC's demand for the return of the escrow funds, as required under the Escrow Agreement.  *See* Gavin Decl., ¶ 14.  Based on this non-response, Mr. Gavin sent a follow-up email to Chrisman, asking for (i) confirmation that the escrow funds were still in the account designated by the JVA and the Escrow Agreement, (ii) if they were, documentation to show that the funds had never been taken out of the escrow account, and (iii) if the funds were not still in the account, all documentation relating to the escrow agent's movement of the funds.  *Id.* ¶ 15; *see also* copy of such e-mail correspondence, attached hereto as **Exhibit K**.  Notwithstanding the fact that Chrisman opened this email correspondence as well, and that he owes CCTC a fiduciary duty under the Escrow Agreement, he once again refused to even

respond to CCTC's message.  *See* Gavin Decl., ¶ 15.

CCTC did, on the other hand, have a videoconference with Shiva on March 5, 2024, based on Shiva's request in response to CCTC's demand letter.  *Id.* ¶ 16.  During the videoconference, which was attended by Shiva, Mr. Gavin, Mr. Lang, and Mr. Terry Patton, the founder of CCTC and the Chairman of its Board, Shiva first advised that Chrisman would not be participating in the call and that he would not speak to CCTC unless the company's representatives were physically present in Las Vegas.  *Id.*  Shiva also stated, for the first time, that Capital Pure tried sending the funds required to be delivered under the JVA to CCTC, but that they were denied because CCTC's bank did not have the capacity to receive the funds.  *Id.*  Shiva told CCTC that if it had its bank write a letter advising that it would accept the funds, the funds would then be delivered.  *Id.*  Shiva also told Mr. Gavin, Mr. Lang, and Mr. Patton that he was willing to send even more money than the parties initially agreed to, and that they would not need to work for the rest of their lives.  *Id.*  Shiva promised that the funds would be delivered within a month's time.  *Id.*

After the parties held their videoconference, CCTC never received any funds from Capital Pure, nor any instructions on how its bank should get in touch with Capital Pure's bank to resolve any issues that Shiva was talking about.  *Id.*  ¶ 17.  Accordingly, on March 26, 2024, Mr. Gavin e-mailed Shiva to state that there were only a few days left until the end of the month, and CCTC had not received any update on its demand, nor did it receive a refund of the escrow deposit.  *Id.*

In response to Mr. Gavin's email, Shiva sent Mr. Gavin an e-mail on March 27, 2024, in which he stated that if CCTC rescinded its demand letter and executed the attached escrow release agreement, a refund of the escrow deposit would then be processed.  *Id.*  Shiva attached a document titled Mutual Release for Escrow (hereinafter, the "Escrow Release"), which stated that upon its execution, the escrow funds would be returned to CCTC.  *Id.*; *see also* copy of such correspondence, attached as **Exhibit L**.  However, the Escrow Release was actually an attempt by the Counter-defendants to sneak a global and complete release of liability into a purported escrow release agreement, without the parties ever discussing or agreeing to that type of arrangement.

For example, the Escrow Release stated that the parties, including their officers, directors, employees, agents, and others "fully release, acquit, and forever discharge JCPC, JPC, each other

9

mutually and all other persons interested and concerned, of and from all claims, actions, causes of action and suits for damages, at law and in equity, regarding said escrow." *See* Exhibit L, at 3.[1]

The above-referenced language is made even more troubling by a term that purports to protect Chrisman, Chrisman, P.C., and Capital Pure from any future non-performance under the terms of the Escrow Agreement, including a failure on any of their parts to return the escrow deposit as promised. *Id.* (purporting to excuse JCPC and JPC from all claims arising out of the "performance or non-performance of their duties under this MRFE"). Finally, even if those terms would have been acceptable to CCTC—which they were not—the Escrow Release inexplicably stated that CCTC would receive a return of only $324,240, rather than the full amount of the escrow deposit of $336,000. *Id.* at 3, 5.

Because the Escrow Release was completely improper and inconsistent with the parties' agreements and obligations thereunder, CCTC's counsel sent a final demand letter on March 28, 2024. *See* Declaration of David B. Barney, Esq. ("Barney Decl."), attached hereto as **Exhibit M**, ¶ 3; *see also* true and correct copy of such demand letter, attached hereto as **Exhibit N**. The March 28 demand letter was sent via certified mail and e-mail to Capital Pure, Chrisman, Shiva, Vikhyat, and the final Counter-defendant, Hannah Dawn Prakash. *See* Exhibit N, at 1. In the demand letter, CCTC advised of the Counter-defendants' various breaches of their contractual obligations to CCTC, and also demanded that Counter-defendants return the entirety of the escrow funds to CCTC, immediately. *Id.* at 2. CCTC demanded that Capital Pure respond to the letter by April 5, 2024. *Id.* at 3.

Instead of responding to the letter or otherwise sending the funds back to CCTC, Capital Pure filed the present lawsuit against CCTC, stating completely sham and frivolous claims, in a clear effort to intimidate CCTC from vindicating its rights. *See* Barney Decl., ¶ 3; *see generally* Complaint (ECF No. 1), on file herein. After filing its Complaint, Capital Pure's first counsel sent an email to CCTC's counsel in which he advised that the escrow funds would be returned to CCTC. *See* Barney Decl., ¶ 4; *see also* copy of such correspondence, attached hereto as **Exhibit O**. In

---

[1] Notably, both Chrisman, P.C. and Capital Pure are defined as "JCPC." Exhibit L, at 3.

particular, Capital Pure's counsel stated the following: "Capital Pure Assets will instruct the Escrow that it does not object to the release of the escrow funds and that they should be returned to the source account from which they were sent." Exhibit O.

After several days had passed without CCTC receiving the escrow funds as promised, CCTC's counsel followed up with an e-mail asking Capital Pure's counsel for a status update regarding the return of the escrow funds. *See* Barney Decl., ¶ 5; copy of such correspondence, attached hereto as **Exhibit P**. After initially stating he would "check on the escrow funds," and CCTC's counsel following up once again, Capital Pure's counsel stated that Capital Pure "has reconsidered its position on the escrow and objects to the escrow amount being returned." *See* Exhibit P, at 1. While Capital Pure's initial counsel promised more details in the coming weeks about the status of the escrow deposit, no update or any refund of the escrow funds was ever provided by Capital Pure or its counsel. *See* Barney Decl., ¶ 5; Exhibit P, at 1.

With no other option after Capital Pure—now through its counsel—continued to play its cat-and-mouse game of promising to deliver funds and then making excuses when the payment becomes due, CCTC filed its Answer and Counterclaim seeking, among other things, the return of the escrow funds immediately, which CCTC unfortunately believes may have already been squandered or otherwise converted by Capital Pure. *See, e.g.*, CCTC's Answer and Counterclaim (ECF No. 5; hereinafter, the "Counterclaim"), ¶¶ 127-139. But because those funds are of critical importance in this case, both based on the parties' agreements with one another and because CCTC has significant doubts that Capital Pure is anything other than a shell corporation designed to defraud unsuspecting victims like CCTC, CCTC moves the Court to enjoin the dissipation of the $336,000 escrow deposit by (i) requiring the Counter-defendants to account for the escrow funds and confirm they are still being held in the designated escrow account, and (ii) requiring that the Counter-defendants not transfer, move, convert or otherwise dissipate **any** of the $336,000 escrow funds until a final judgment is entered in this case, or an Order of this Court is obtained allowing for the withdrawal of the funds. In the alternative, CCTC requests that the Court require Counter-defendants to deposit with the Court the total amount of $336,000, which CCTC deposited into escrow and which should be held by the Court for safekeeping during the pendency of this action.

### III.    LEGAL STANDARDS

Under Federal Rule of Civil Procedure 65, a court may issue a preliminary injunction upon notice to the party against whom the relief is sought. *See* Fed. R. Civ. P. 65(a)(1). "[W]here (as here) the Court's jurisdiction is based on diversity of citizenship, the Court must apply state law regarding the availability of preliminary injunctive relief rather than federal law if the state law is outcome-determinative." *See Hellerstein v. Desert Lifestyles, LLC*, No. 15-cv-01804-RFB-CWH, 2015 WL 6962862, at *5 (D. Nev. Nov. 10, 2015) (citing *Sims Snowboards, Inc. v. Kelly*, 863 F.2d 643, 646-47 (9th Cir. 1988)). "This is because a federal court adjudicating a State-created right solely because of diversity of citizenship is for that purpose, in effect, only another court of the State, and therefore cannot substantially affect the enforcement of the right as given by the State." *Id*. (internal quotations omitted).

NRS 33.010 provides the bases upon which a preliminary injunction may be granted under Nevada law. That statute provides as follows:

> An injunction may be granted in the following cases:
>
> 1.    When it shall appear by the complaint that the plaintiff is entitled to the relief demanded, and such relief or any part thereof consists in restraining the commission or continuance of the act complained of, either for a limited period or perpetually.
> 2.    When it shall appear by the complaint or affidavit that the commission or continuance of some act, during the litigation, would produce great or irreparable injury to the plaintiff.
> 3.    When it shall appear, during the litigation, that the defendant is doing or threatens, or is about to do, or is procuring or suffering to be done, some act in violation of the plaintiff's rights respecting the subject of the action, and tending to render the judgment ineffectual.

NRS 33.010(1)-(3).

As set forth in detail below, injunctive relief is appropriate under any—and all—of the standards above, to ensure that the Counter-defendants do not continue their fraudulent conduct, and that the escrow funds are not completely squandered by the time this case is decided.

### IV.    LEGAL ARGUMENT

#### A.    A Preliminary Injunction is Appropriate under NRS 33.010(1).

A preliminary injunction is appropriate where it appears by a complaint that the plaintiff is

entitled to the relief it seeks, and such relief consists of restraining the commission or continuance of the act complained of, either for a limited period or perpetually. *See* NRS 33.010(1). This case is the exact situation in which such an injunction is warranted under the statute.

As set forth in the Counterclaim, CCTC and Capital Pure entered into the JVA, under which CCTC agreed to deposit $336,000 into an escrow account held by an attorney as the independent escrow agent. ECF No. 5, ¶¶ 23-25. Around the same time, CCTC, Capital Pure, and Chrisman, P.C. entered into the Escrow Agreement, which contained the terms under which Chrisman, P.C. would manage the escrow funds, including his release of the same at the appropriate time. *See id.* ¶ 27. The Escrow Agreement also states that Chrisman, P.C., as the escrow agent, owed CCTC and Capital Pure a fiduciary duty. *See id.* ¶ 30.

In accordance with the terms of the JVA and the Escrow Agreement, CCTC deposited $336,000 into the escrow account designated by Capital Pure and Chrisman, P.C. *Id.* ¶ 31. Capital Pure admits these facts in its own Complaint, and in the Counter-defendants' Answer to the Counterclaim. *See* ECF No. 1, ¶ 40; ECF No. 18, ¶ 31. But after CCTC entrusted the Counter-defendants with these funds, Capital Pure and Chrisman, P.C. completely failed to comply with their respective obligations under the JVA and the Escrow Agreement. *See* ECF No. 5, ¶¶ 33-59. In particular, Capital Pure never delivered the funds it promised to deliver, which the escrow funds allegedly would be used to pay the bank fees associated with obtaining a $20 million SBLC, and Chrisman and Chrisman, P.C. never returned the escrow funds to CCTC upon its demand, let alone responded to CCTC when it asked to confirm that the funds were still escrow and that they had not been depleted. *Id.* In fact, the only communication from the Counter-defendants regarding the amount of funds left in the escrow account demonstrated that at least some of the funds had been converted by either Capital Pure or Chrisman, P.C.—the parties in control of the subject account. *See id.* ¶ 55.

The only reasonable conclusion to draw from the Counter-defendants' conduct is that they have converted the escrow funds deposited by CCTC for their own use, or otherwise improperly dissipated the funds, and to the exclusion of CCTC. *See id.* ¶¶ 128-129. CCTC therefore submits that the only way to preserve any value left in the escrow, and to prevent the Counter-defendants

13

from completely depriving CCTC of the value that Chrisman, P.C. was required to keep safe in accordance with the terms of the Escrow Agreement, is for the Court to issue injunctive relief necessary to account for, secure, and eventually return the escrow funds to CCTC. *Id.* ¶ 85. At this juncture, CCTC simply requests that the Court enjoin any transfers of the funds by (i) requiring the Counter-defendants to account for the $336,000 in escrow funds and provide proof that they are still being maintained in the designated escrow account, and (ii) enjoining the Counter-defendants from any transfers or otherwise converting the $336,000 in the escrow account throughout the pendency of this matter, until the parties' rights in respect of the escrow funds are decided in a final judgment, or by further order of the Court.

As set forth above, CCTC has clearly shown by the allegations in the Counterclaim that it is entitled to the return of escrow funds in the amount of $336,000, and an ultimate award of such relief requires that the Counter-defendants be restrained from converting or otherwise transferring the subject funds until the case is concluded. An injunction under NRS 33.010(1) is therefore warranted and should be granted by the Court for the purpose of preserving the *status quo* in this case and preventing any further loss of funds due to the Counter-defendants' actions.

**B.    A Preliminary Injunction is Appropriate under NRS 33.010(2).**

Injunctive relief is also appropriate under NRS 33.010(2), where it appears by the complaint or other evidence that commission or continuance of some act during the litigation would produce great or irreparable harm to the plaintiff, if such action is not restrained by the Court. Injunctive relief under this standard is also appropriate, independent of the authority set forth above.

To obtain injunctive relief under NRS 33.010(2), a moving party must establish: "(1) a likelihood of success on the merits; and (2) a reasonable probability that the non-moving party's conduct, if allowed to continue, will cause irreparable harm for which compensatory damage is an inadequate remedy." *Univ. and Comm. Coll. of So. Nev. v. Nevadans for Sound Gov't*, 120 Nev. 712, 721, 100 P.3d 179, 187 (2004) (citing *S.O.C., Inc. v. Mirage Casino-Hotel*, 117 Nev. 403, 408, 23 P.3d 243, 246 (2001)). "[C]ourts also weigh the potential hardships to the relative parties and others, and the public interest." *Id.* (citing *Clark Co. Sch. Dist. v. Buchanan*, 122 Nev. 1146,

1150, 924 P.2d 716, 719 (1996)).  CCTC meets all of these criteria, declaratively.

> **i.       CCTC is Likely to Succeed on the Merits of its Claims for Breach of the Escrow Agreement, Breach of Fiduciary Duties, and Conversion.**

With regard to a likelihood of success on the merits, CCTC is likely to succeed on its claims for breach of the Escrow Agreement, breach of fiduciary duties and conversion, in relation to the Counter-defendants' continued possession of the escrow funds.  With regard to its Sixth Claim for Relief, for breach of contract against Chrisman, P.C., CCTC alleges that Chrisman, P.C. breached the Escrow Agreement by (i) failing to begin the process to release the funds to CCTC upon its demand, and (ii) failing to actually release the funds to CCTC, in accordance with the terms of the agreement.  *See* Counterclaim, ¶¶ 103-108.

To prevail on its claim for breach of contract, CCTC must establish "(1) the existence of a valid contract, (2) that the plaintiff performed, (3) that the defendant breached, and (4) that the breach caused the plaintiff damages." *Iliescu, Tr. of John Iliescu, Jr. & Sonnia Iliescu 1992 Fam. Tr. v. Reg'l Transportation Comm'n of Washoe Cnty.*, 138 Nev. Adv. Op. 72, 522 P.3d 453, 458 (Nev. App. 2022).  With regard to the first element above, "[b]asic contract principles require, for an enforceable contract, an offer and acceptance, meeting of the minds, and consideration." *May v. Anderson*, 121 Nev. 668, 672, 119 P.3d 1254, 1257 (2005) (citing *Keddie v. Beneficial Ins., Inc.*, 94 Nev. 418, 421, 580 P.2d 955, 956 (1978) (Batjer, C.J., concurring)).  There was an offer and acceptance, as well as meeting of the minds with respect to the Escrow Agreement, as evidenced by a writing signed by all of the parties.  *See* Exhibit C, at 5.  There was also consideration, as Capital Pure and CCTC stood to benefit through their engagement in the JVA, and Chrisman, P.C. was entitled to compensation for acting as the escrow agent.  *Id.* at 4.  Therefore, the Escrow Agreement is a valid and binding contract between Capital Pure, CCTC, and Chrisman, P.C.

With regard to the second element above, CCTC complied with its obligations under the Escrow Agreement, by (i) depositing $336,000 into the escrow account that was designated by Capital Pure and Chrisman, P.C., *see* Exhibit D, and (ii) making demand for the release of the escrow funds, in accordance with Section 3.3 of the Escrow Agreement.  *See* Exhibit I, at 4. Therefore, CCTC complied with its obligations under the Escrow Agreement, and this element is

also satisfied.

Regarding the third element set forth above, Chrisman, P.C. breached the Escrow Agreement in several ways. First, he failed to notify any of the parties that CCTC had made a demand for the release of the escrow funds and that the other party had thirty days to object. *See* Gavin Decl., ¶ 14. Second, he failed to release the funds to CCTC after Capital Pure made no objection to the release of the funds within the above-referenced timeframe. *See id.* ¶ 18. Chrisman also failed to respond to CCTC's requests for information about the status of the escrow funds, in violation of his contractual and fiduciary duties to CCTC, which is discussed in further detail below. *See id.* ¶ 15. Accordingly, there can be no reasonable dispute that Chrisman, P.C. breached its obligations under the Escrow Agreement.

Finally, with regard to damages, a party must show that it has been deprived of the value it expected to receive, had the opposing party complied with its contractual obligations. *See Dynalectric Co. v. Nev., Inc. v. Clark and Sullivan Constructors, Inc.*, 127 Nev. 480, 484 n.4, 255 P.3d 286, 289 n.4 (2011). CCTC has been damaged, among other ways, by being deprived of the $336,000 it was entitled to receive upon demand under the terms of the Escrow Agreement. It has been further deprived by the fact that it continues to accrue interest on the funds it borrowed to deposit such amount, which the parties knew would occur from the time they entered into the subject transaction with CCTC. *See* Gavin Decl., ¶ 10. In light of these facts, there is a clear likelihood that CCTC will prevail on its claim for breach of the Escrow Agreement against Chrisman, P.C.

The same is true regarding CCTC's claim for breach of fiduciary duties against Chrisman and Chrisman, P.C. *See* Counterclaim, ¶¶ 115-120. To prevail on this claim, CCTC must establish: "(1) [the] existence of a fiduciary duty, (2) breach of the duty, and (3) damages as a result of the breach." *See Guzman v. Johnson*, 137 Nev. 126, 132-33, 483 P.3d 531, 538 (2021) (citing *Guilfoyle v. Olde Monmouth Stock Transfer Co.*, 130 Nev. 801, 812-13, 335 P.3d 190, 198 (2014)). A fiduciary duty can be created by contractual agreement, statute, or where one party is otherwise under a duty to act for or give advice to another upon matters within the scope of their relationship. *See Stalk v. Mushkin*, 125 Nev. 21, 28, 199 P.3d 838, 843 (2009) (citing Restatement

16

(Second) of Torts § 874 cmt. A (1979)); *Israyelyan v. Chavez*, No. 78415, 136 Nev. 832, at \*4, 466 P.3d 939, at \*4 (Jul. 1, 2020) (unpublished). Chrisman and Chrisman, P.C. owe CCTC a fiduciary duty, both under the terms of the Escrow Agreement, *see* Exhibit C, at 3 ("A fiduciary relationship shall exist between ESCROW and Investor / JV partner, and ESCROW acknowledges its fiduciary and statutory obligations"), and under clear Nevada Supreme Court precedent holding that when "managing monies deposited in escrow, the escrow agent is required to conduct his affairs with scrupulous honesty, skill and diligence." *Broussard v. Hill*, 100 Nev. 325, 329, 682 P.2d 1376, 1378 (1984). In addition, while CCTC is informed and believes that neither Chrisman nor Chrisman, P.C. is licensed to act as an escrow agent in Nevada, any escrow agent or agency is required to "conduct the business of the escrow agency openly, fairly and honestly, and shall at all times conform to the accepted business ethics and practices of the escrow agency business." NAC 645A.220(1). Therefore, both Chrisman and Chrisman, P.C. owe CCTC fiduciary duties, including the duties of honesty and diligence.

With regard the second element above, Chrisman and Chrisman, P.C. violated these fiduciary duties to CCTC, by colluding with Capital Pure and the other Counter-defendants to resist any release of the escrow funds to CCTC, notwithstanding Chrisman, P.C.'s duty to administer those funds pursuant to Section 3.3 of the Escrow Agreement. *See* Gavin Decl., ¶¶ 17-18. Chrisman and Chrisman, P.C. also breached these fiduciary duties by failing to respond to CCTC's numerous demands for the release of the escrow funds, or even just confirming that the escrow funds were still in the designated account and had not been spent. *Id.* ¶¶ 14-15, 18. Therefore, the second element of this claim is also satisfied.

The conduct of Chrisman and Chrisman, P.C. in this regard has also damaged CCTC, as set forth above, as it has deprived CCTC of the funds it was entitled to recover under the terms of the Escrow Agreement, and CCTC continues to suffer damages by incurring continuing interest on those amounts. In light of the above, CCTC has a likelihood of success on the merits of its claim for breach of fiduciary duty.

Finally, CCTC also has likelihood of success on its claim for conversion against all of the Counter-defendants. *See* Counterclaim, ¶¶ 126-133. As set forth above, CCTC was entitled to

receive a refund of the escrow amount based on Section 3.3 of the Escrow Agreement. *See* discussion, *supra*, at 18. But because the Counter-defendants appear to be working together to deprive CCTC of its right to possess and have those funds back, *see* Gavin Decl., ¶ 17, and because Capital Pure appears to also be exerting control over the use of those funds, *see* Barney Decl., ¶¶ 4-5, the Counter-defendants have exerted improper control and dominion over the funds belonging to CCTC, depriving CCTC of the property it is lawfully entitled to receive and therefore converting the property for their own use. *See Evans v. Dean Witter Reynolds, Inc.*, 116 Nev. 598, 606, 5 P.3d 1043, 1048 (2000). Because CCTC can satisfy these requirements as well, it has demonstrated a likelihood of success on the merits of its claims for breach of the Escrow Agreement, breach of fiduciary duties, and conversion, all of which go directly to the Counter-defendants' unlawful continued possession and potential misuse of the escrow funds at issue.

**ii.    CCTC Will Suffer Irreparable Injury if an Injunction is Not Issued.**

The element of irreparable harm is satisfied in two ways. The first is that if an injunction is not issued, CCTC will likely suffer irreparable harm because the escrow funds are at risk of being completely dissipated and depleted, which would leave CCTC unable to be made whole in light of its equitable and other remedies. While monetary harm is generally not considered to be irreparable, the Ninth Circuit Court of Appeals has held that "[a] court has the power to issue a preliminary injunction in order to prevent a defendant from dissipating assets in order to preserve the possibility of equitable remedies." *See Reebok Int'l, Ltd. v. Marnatech Enterprises, Inc.*, 970 F.3d 552, 559 (9th Cir. 1992) (quoting *Republic of the Phillippines v. Marcos*, 862 F.2d 1355, 1364 (9th Cir. 1988)).

Thus, the first reason irreparable harm is present is that the depletion of escrow funds itself constitutes irreparable harm. Courts in the Ninth Circuit have routinely held that depletion of funds or assets held in trust constitutes irreparable harm for purposes of a temporary restraining order or preliminary injunction. *See, e.g.*, *Jem D. Int'l (Michigan), Inc. v. JJD Produce, LLC*, No: 22CV383-GPC(JLB), 2022 WL 1017900, at *4 (S.D. Cal. Apr. 5, 2022) (collecting cases). Courts have expressly applied this legal principle to disputes over escrow funds and have expressly found that "distribution of the escrow may constitute irreparable harm." *See In re Wolf*, 558 B.R. 140,

18

144 n.5 (Bankr. E.D. Pa. 2016) (citing *In re Flight Transp. Corp. Sec. Litig.*, 730 F.2d 1128, 1133-34 (8th Cir. 1984)); *Basin Elec. Power Cooperative v. MPS Generation, Inc.*, 395 F. Supp. 2d 859, 867 (D.N.D. 2005).  Similarly, courts have found that where statutes provide for injunctive relief where a breach of trust has occurred, as do Nevada's, injunctive relief is appropriate to prevent the breach of trust, including where the alleged breach involves an allegation that an escrow agent is acting improperly.  *See Bates Energy Oil & Gas, LLC v. Complete Oil Field Servs., LLC*, No. SA-17-CA-808-XR, 2017 WL 4051569, at \*7 (W.D. Tex. Sept. 13, 2017) (citing Texas trust statutes nearly identical to their Nevada counterparts).

CCTC faces a likely threat of irreparable harm if an injunction is not entered, because the Counter-defendants have proven themselves untrustworthy on numerous occasions, and the facts indicate that they appear to have transferred at least a portion of the escrow funds from the designated account.  Notwithstanding its numerous promises to either refund the escrow funds to CCTC, or actually comply with its contractual obligations, Capital Pure has not once followed through on either of those promises in over a year.  *See* Gavin Decl., ¶¶ 9-13, 16-18.  In addition, Chrisman—who is expressly named as a fiduciary of CCTC—has refused to even acknowledge his receipt of numerous requests for confirmation that the funds are still in the designated account.  *Id.* ¶¶ 13-15.  The only acknowledgment of the funds made by the Counter-defendants was Capital Pure's offer to return a portion of the funds if CCTC executed a global release of the parties, which was never a term the parties agreed to, no less contemplated.  *Id.* ¶ 17; Exhibit L.  In light of these facts, there is strong evidence that the escrow funds either have been converted, or that they will be converted if no injunction is granted, prior to the entry of a final judgment in this case.

In addition, and as set forth in *Bates Energy Oil & Gas*, irreparable harm is created when there is a breach of trust by an individual holding property belonging to others.  As in that case, where the Court found that Texas law provided for an injunction where an escrow agent held property in trust and there was a risk that the property would be depleted, NRS 163.115(3)(b) provides that if a trustee commits or threatens to commit a breach of trust, an injunction is available to prevent the breach of trust from occurring.  Therefore, irreparable harm is found, and an injunction is appropriate under Nevada law, both in the case of escrow funds being depleted, and

to prevent a purported escrow agent from committing a breach of trust.

Here, CCTC is informed and believes that the escrow funds—to the extent they have not already been spent by the Counter-defendants—are the only real funds available to satisfy a judgment in their favor at the end of trial and to satisfy their claims for equitable relief, including for a constructive trust, or for disgorgement or restitution of the funds being held and/or converted by the Counter-defendants. *See* Counterclaim, ¶ 131. There is no evidence that Capital Pure is a legitimate business, or anything other than a sham organization posing as a legitimate business for the purpose of defrauding entities like CCTC. The evidence in front of the Court shows that Capital Pure is an operation owned by father, son, and stepmother, *see* Gavin Decl. ¶ 5, and that it has no actual office, but only the address of a UPS Store. *See* Barney Decl., ¶ 6; **Exhibit Q**. It also has a website that says nothing of substance, nor does it explain anything cognizable about what the company does, and the only testimonials are from the company's own principals named "CEO" and "Chairman," Hannah Dawn Prakash and Shiva Prakash, respectively. Exhibit Q. Finally, the SBLC scam is a well-known fraud scheme, familiar to the FBI, FTC and SEC and other governmental entities, whereby an alleged procurer of funds promises to provide funding that does not exist in the form of a SBLC, for the sole purpose of defrauding individuals and companies seeking such funding through pre-payment of "escrow fees," "bank fees" and other charges, before the SBLC can be issued. *See* ECF No. 5, ¶ 1. Of course, the SBLC is never issued because an actual source of the funds does not exist. That is the exact scheme perpetrated by the Counter-defendants against CCTC in this case.

With respect to Chrisman and Chrisman, P.C., while a duly licensed escrow agent is required to keep a bond worth $100,000 for the amount of escrow funds deposited in this case, because there is no evidence that Chrisman or Chrisman, P.C. is licensed or registered as an escrow agent in Nevada, a bond is not available to satisfy any potential judgment. *See* NRS 645A.041(1), (4). In light of the above, considering a sham company with no actual business, a well-know fraud scheme like the SBLC scam and an escrow agent with no evidence of licensure or bond, the escrow funds appear to be CCTC's last hope to recover any of its funds in this case, and CCTC is likely to suffer irreparable harm if the Court does not enjoin the Counter-defendants from transferring or

20

otherwise converting whatever of the escrow funds may be left.

**iii.    The Relative Hardships of the Parties Weigh in Favor of an Injunction.**

This evaluation is easy in this case. Under no set of facts would either Capital Pure (or its principals), or Chrisman, P.C. (or its owner), be entitled to actually use the funds that CCTC deposited into escrow. *See, e.g.*, Exhibit C, at 2-3. At best, Capital Pure would be able to use the funds to pay the bank fees associated with providing a $50 million SBLC, but it appears for many reasons that will never occur. *Id.* Therefore, if the Court requires the Counter-defendants to account for the escrow funds and restrains them from transferring or otherwise depleting those funds while this case is ongoing, there is absolutely no harm or hardship suffered by Counter-defendants, who have no right, title or interest in those funds in the first place.

On the other hand, if an injunction is not issued, CCTC runs the risk of losing the only concrete source of recovery that may be available, as it has doubts that Capital Pure or its principals have any legitimate assets and that Capital Pure has any legitimate business. If the escrow funds are converted by the Counter-defendants prior to the time a final judgment is entered—to the extent they are still even available—this will deprive CCTC of the primary asset it knows of because it provided those funds to Capital Pure and the escrow. In light of these facts, the balance of the hardships weighs heavily in favor of CCTC and the Court's grant of a preliminary injunction.

**iv.    The Public Interest Weighs in Favor of an Injunction.**

The State of Nevada has a policy of ensuring that "escrow agents," or any person in the business of managing, conducting or supervising an escrow or escrow-related transaction, is held accountable and conducts him or herself in the most scrupulous manner. *See* NRS 645A.010(1), (9); NAC 645A.220(1). In fact, this policy is so important that the State requires such individuals to hold a license and obtain a bond, before they engage in this type of business, so that the public is protected. *See* NRS 645A.015(1); NRS 654A.085(3). Nevada's public policy clearly favors the ethical, honest, and forthright handling of funds entrusted to an independent escrow.

CCTC is not aware of Chrisman or Chrisman, P.C. holding the requisite license to act as an escrow agent in this matter, and CCTC is not convinced that either of them falls within the exception to the licensure requirement set forth in NRS 645.015(c). In any event, Chrisman and

21

Chrisman, P.C. have proven themselves to be untrustworthy, and not forthcoming while acting as an escrow agent, by failing to even respond to CCTC's demands for information to confirm that the funds are even still being maintained in the designated escrow account. In addition, Capital Pure's demonstrated control over the escrow funds and Chrisman calls into question Chrisman's and Chrisman's P.C.'s actions as an independent escrow agent and fiduciary, when they appear to be acting only in the interests of Capital Pure and its principals. In light of the above, the public interest weighs heavily in favor of preserving the integrity of an escrow arrangement and ensuring that CCTC is not further deprived of any funds that the Counter-defendants may have converted— or that they may continue to dissipate—if an injunction is not entered and the Counter-defendants unlawfully use the escrow account without regard to any of their contractual or legal obligations. In light of the above, CCTC has satisfied all of the criteria to obtain a preliminary injunction under NRS 33.010(2), and the Court should enter an injunction requiring the Counter-defendants to account for the escrow funds and to prohibiting them from transferring or otherwise converting such funds throughout the pendency of this lawsuit.

### C.    A Preliminary Injunction is Appropriate under NRS 33.010(3).

Under NRS 33.010(3), an injunction is appropriate where a defendant is doing or threatens to do some act in violation of the plaintiff's rights, which would render a judgment in the plaintiff's favor ineffectual. *See* Fed. R. Civ. P. 33.010(3). As set forth above, the facts in this case present this exact scenario because CCTC deposited $336,000 based upon what appears to be a classic fraudulent scheme involving a sham business and an unlicensed escrow agent. The numerous excuses of Capital Pure in promising to deliver the funds and then failing to deliver the funds time after time with increasingly unbelievable excuses, shows that this is a fraudulent scheme where CCTC may never recover the funds it advanced in good faith to a purported escrow agent for safekeeping. In addition, there is no evidence by way of either an existing business, a surety bond, or otherwise, to show that CCTC has any chance to recover anything besides the escrow funds it knows it provided to the escrow agent. In other words, the only funds that CCTC knows that Capital Pure has are the funds it stole from CCTC by the SBLC fraud scheme. Therefore, a preliminary injunction is appropriate for the purpose of ensuring that (i) the escrow funds are still

22

being held by the Counter-defendants, and (ii) that CCTC can recover at least its own money back, should it prevail on its claims in this case.  Once again, there would be no harm suffered by the other parties, and an injunction would simply preserve the *status quo* and ensure that these funds are available for whomever is entitled to receive them once this case is decided.

**D.      In the Alternative, the Court Should Compel the Counter-defendants to Deposit the Escrow Funds with the Court.**

It is well established that "[f]ederal courts have inherent powers to manage their own proceedings and to control the conduct of those who appear before them." *Erickson v. Newmar Corp.*, 87 F. 3d 298, 303 (9th Cir. 1996) (citing *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991)). These inherent powers include the power to order various types of "administrative" actions, including requiring a party to post security with the court when warranted by the circumstances of a case.  *See Simulnet East Assocs. v. Ramada Hotel Operating Co.*, 37 F.3d 573, 574 (9th Cir. 1994) (citing *In re Merrill Lynch Relocation Mgmt., Inc.*, 812 F.2d 1116, 1121 (9th Cir. 1987)); *see also In re Villa Marina Yacht Harbor, Inc.*, 984 F.2d 546, 548-49 (1st Cir. 1993).  Courts have not hesitated to order this type of relief, by requiring a party to deposit into the Court disputed funds, which will ultimately be awarded to one party at the end of the litigation.  *See, e.g.*, *In re Villa Marina Harbor*, 984 F.2d at 548-49 (holding that a district court has the power to require a party to deposit funds with the court, to "preserve the *status quo* with no harm to either party pending a hearing on the merits"); *Qwest Corp. v. City of Portland*, 204 F.R.D. 468, 470 (D. Or. 2001) (same).  This type of relief is appropriate here, where the safeguarding of the escrow funds is paramount to the ability of CCTC to recover anything in this case, and no party will suffer any harm if the funds are placed in the Court.

There can be no dispute that the escrow funds were intended to be held and kept safe until they were required to be released under the terms of the Escrow Agreement.  *See* Exhibit C, at 2-3.  Based on the evidence referenced above, including Counter-defendants' many promises to return the escrow funds and then inexplicably changing course when the time came to refund the deposits, as well as their contention that less than the full amount was left as of March of 2024 and the escrow agent's complete refusal to even speak with CCTC, or to provide any evidence

confirming that the funds are still in the escrow account, Counter-defendants have shown themselves to be untrustworthy with the escrow funds in their possession, and it would be appropriate for the Court to compel Counter-defendants to deposit those funds with the Court, to ensure that the *status quo* is maintained until the Court renders a final decision on who is entitled to the funds.  This would cause zero hardship or prejudice to any of the parties, as the funds are required to be kept in a sequestered account in any event, but it would preserve at least some of the value for the litigants in this case, as CCTC is informed and believes that Capital Pure has no assets or any funds that could satisfy a final judgment in this case.  The Court can and should require the Counter-defendants to deposit the escrow funds of $336,000 into the Court until the final judgment is rendered in this case, or until further order of this Court regarding the disposition of these funds that indisputably belong to CCTC.

## V.    CONCLUSION

In light of the above, the Court should grant a preliminary injunction (i) requiring the Counter-defendants to account for the funds from the time of CCTC's deposit until the present; and (ii) prohibiting the Counter-defendants from transferring, dissipating or depleting the escrow funds in any amount, until a final judgment is entered in this case, or further order of the Court. Alternatively, the Court should compel the Counter-defendants to account for the escrow funds and then deposit $336,000 with the Court, to preserve the status quo and ensure the security of the escrow funds until final judgment, or further order of the Court.

Dated this 1st day of August, 2024.

SKLAR WILLIAMS PLLC

*/s/ David B. Barney*_____
Stephen R. Hackett, Esq. (NBN: 5010)
David B. Barney, Esq. (NBN: 14681)
410 South Rampart Blvd, Suite 350
Las Vegas, NV 89145
*Attorneys for Defendant/Counterclaimant*
*CC Technology Corporation*

**<u>CERTIFICATE OF SERVICE</u>**

The undersigned hereby certifies that on the 1st day of August, 2024, a true and correct copy of the foregoing **DEFENDANT/COUNTERCLAIMANT CC TECHNOLOGY CORPORATION'S MOTION FOR PRELIMINARY INJUNCTION OR, IN THE ALTERNATIVE, TO COMPEL DEPOSIT OF ESCROW FUNDS WITH THE COURT** was filed electronically with the Clerk of the Court by submission to the electronic filing and service system (CM/ECF) at the United States District Court, District of Nevada.  CM/ECF will provide copies to all parties and counsel of record registered to receive CM/ECF notification.

*/s/ Jessica Uriostegui*
An employee of Sklar Williams PLLC

25

**INDEX OF EXHIBITS**

| EXHIBIT | DESCRIPTION |
|---------|-------------|
| A | Declaration of Thomas Gavin |
| B | Joint Venture Agreement |
| C | Escrow Agreement |
| D | Wire Transfer Record |
| E | E-mail Correspondence dated August 23, 2023 |
| F | E-mail Correspondence dated September 21-25, 2023 |
| G | E-mail Correspondence dated September 29-October 3, 2023 |
| H | December 6, 2023 Letter from Capital Pure Assets LTD |
| I | March 1, 2024 Demand Letter |
| J | Return Receipt for March 1, 2024 Demand Letter |
| K | E-mail Correspondence dated March 7, 2024 |
| L | E-mail Correspondence dated March 27, 2024 |
| M | Declaration of David B. Barney, Esq. |
| N | March 28, 2024 Demand Letter |
| O | E-mail Correspondence dated April 8, 2024 |
| P | E-mail Correspondence dated April 8-25, 2024 |
| Q | Screenshots of Capital Pure Assets, LTD Website |