Stephen R. Hackett, Esq.
Nevada Bar No.: 5010
David B. Barney, Esq.
Nevada Bar No.: 14681
SKLAR WILLIAMS PLLC
410 South Rampart Boulevard, Suite 350
Las Vegas, Nevada 89145
Telephone: (702) 360-6000
Facsimile:  (702) 360-0000
Email: shackett@sklar-law.com
          dbarney@sklar-law.com
*Attorneys for Defendant/Counterclaimant*
*CC Technology Corporation*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| CAPITAL PURE ASSETS, LTD, a Nevada limited liability company,<br><br>Plaintiff,<br><br>v.<br><br>CC TECHNOLOGY CORPORATION, a Colorado corporation; DOES 1 through 10, inclusive; and ROE CORPORATIONS 1 through 10, inclusive,<br><br>Defendants. | Case No. 2:24-cv-00680-NJK<br><br><br>**DEFENDANT/COUNTERCLAIMANT CC TECHNOLOGY CORPORATION'S REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION OR, IN THE ALTERNATIVE, TO COMPEL DEPOSIT OF ESCROW FUNDS WITH THE COURT** |
| CC TECHNOLOGY CORPORATION, a Colorado corporation,<br><br>Counterclaimant,<br><br>v.<br><br>CAPITAL PURE ASSETS, LTD, a Nevada limited liability company; SHIVA PRAKASH, an individual; HANNAH DAWN PRAKASH, an individual; VIKHYAT PRAKASH, an individual; JAMES CHRISMAN, P.C., a Nevada professional corporation; JAMES P. CHRISMAN, an individual; DOES 1 through 10, inclusive; and ROE ENTITIES I through X, inclusive,<br><br>Counter-defendants. | |

1

Defendant/Counterclaimant CC Technology Corporation ("CCTC"), by and through its attorneys, the law firm of Sklar Williams PLLC, hereby files this Reply ("Reply") in support of its Motion for Preliminary Injunction or, in the Alternative, to Compel Deposit of Escrow Funds with the Court (the "Motion").

This Reply is made and based upon the following Memorandum of Points and Authorities, the exhibits attached hereto, all of the papers and pleadings on file herein, and any oral argument that the Court may allow at a hearing on this matter.

## **MEMORANDUM OF POINTS AND AUTHORITIES**

### I.    INTRODUCTION

In their Opposition to the Motion (ECF No. 26; the "Opposition"), Counter-defendants show exactly why injunctive relief is necessary.  The first reason is that Counter-defendants **admit** the escrow funds are no longer being held or controlled by the escrow agent, James P. Chrisman ("Chrisman") and his entity, James Chrisman, P.C. ("Chrisman, P.C.").  Instead, Counter-defendants make clear that Plaintiff/Counter-defendant Capital Pure Assets, Ltd ("Capital Pure") has somehow come into possession and control of the funds, in contravention of the parties' agreements.  *See, e.g.*, Opposition, at 9 (declaring that "CPA has this money, and is in fact still willing to reimburse CCTC should the Release terms be agreed upon!").  Capital Pure has shown no viable legal basis or other reason it was entitled to come into possession of the funds, nor why it would have any say or control about when and how they should be released, as those terms were expressly set forth in the Escrow Agreement, and the escrow agent—as a fiduciary of both parties—was required to keep the funds safe and within his sole control, in accordance with the agreement's terms.

This leads to the second reason the Opposition is so alarming, and why it actually gives credence to the Motion.  Counter-defendants have provided **no evidence** to actually prove that the escrow funds are where they were deposited by CCTC.  Where is a copy of the bank statement showing the funds are in the account? Where is a declaration **from the escrow agent** stating the funds were never transferred, and that they remain in his control?  And why is a party on the other side of the transaction, who was never supposed to receive the escrow funds, now in control of

them?  Counter-defendants have done absolutely nothing to show, by any real evidence, that the escrow funds are where they are supposed to be.

The only thing the Counter-defendants do is have the main fraud actor in this case, Counter-defendant Shiva Prakash, declare that "[t]he funds in question have been and remain within the confines of the banking/monetizer institutions."  ECF No. 26-1, ¶ 15.  But what banking/monetizer institutions is he vaguely referencing?  The funds were deposited into an American Express account, which had no other role in the transaction.  ECF No. 22-3, Page 7 of 7.  Counter-defendants continue their slippery antics, now toward the Court, and the Court should be very alarmed by the Counter-defendants' attempt to mislead the Court and not resolve the very simple questions of (i) where the funds are, and (ii) how long they have been there.

The third reason the Opposition fails to defeat the Motion is that Counter-defendants' legal arguments are without merit.  With regard to their first legal argument, Counter-defendants cite the general rule that monetary damages do not typically give rise to irreparable harm, but they ignore the case law providing exceptions to that rule, which were cited throughout the Motion.  As set forth in further detail below, CCTC has given several separate exceptions for why irreparable harm exists in this case, and there is absolutely nothing in the Opposition to refute those arguments.

Regarding their second legal argument, Counter-defendants contend that because the escrow agreement is related to other agreements between the parties, CCTC must demonstrate a likelihood of success on the merits of all claims in this case, to satisfy that requirement when seeking injunctive relief.  But there can be no reasonable dispute that a party need only show a likelihood of success on the claims which are relevant to the relief sought, to obtain a preliminary injunction.  This red herring is not supported by fact or law, and CCTC has shown it has a likelihood of success on the merits of the relevant claims, based on facts which are not in dispute.  Because CCTC has satisfied the requirements for injunctive relief, the Court can and should take the non-controversial step of ensuring that the escrow funds in this case are (i) where they are supposed to be, and (ii) not spent before this case is decided.

/ / /

/ / /

3

## II.    LEGAL ARGUMENT

As an initial matter, Counter-defendants ignore the provisions of NRS 33.010, which provide several grounds for the issuance of an injunction.  Because the Opposition focuses on NRS 33.010(2), this Reply will focus on the arguments in the Opposition, which only address the issues of (i) irreparable harm, and (ii) a likelihood of success on the merits.  CCTC nonetheless submits, as set forth in the Motion, that it is also entitled to injunctive relief under NRS 33.010, subsections (1) and (3).

### A.    CCTC Has Satisfied the Irreparable Harm Requirement.

Counter-defendants' first argument is that the Motion should be denied, because CCTC has not shown that irreparable harm exists.  They rely on the standard rule that monetary damages do not constitute irreparable harm, but they fail entirely to refute—let alone even address—the exceptions to the general rule set forth in the Motion.  Because all of the exceptions set forth in the Motion apply, any one of which is sufficient to establish irreparable harm, CCTC has satisfied this requirement for obtaining injunctive relief.

CCTC acknowledges in the Motion that monetary damages typically do not provide the basis for a finding of irreparable harm.  *See* Motion, at 18.  But in certain situations like the one here, courts including the Ninth Circuit Court of Appeals have routinely found that irreparable harm is present, even when a party ultimately seeks monetary damages.  The primary example of this is where the Ninth Circuit found—and has routinely acknowledged—that a preliminary injunction is appropriate "to prevent a defendant from dissipating assets in order to preserve the possibility of equitable remedies."  *See Reebok Int'l, Ltd. v. Marnatech Enterprises, Inc.*, 970 F.2d 552, 559 (9th Cir. 1992) (quoting *Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1364 (9th Cir. 1988) (en banc), *cert. denied*, 490 U.S. 1035 (1989)); *see also Thomas, Head and Greisen Employees Tr. v. Buster*, 95 F.3d 1449, 1456-57 (9th Cir. 1996) (affirming the grant of injunctive relief requiring a deposit funds into the court registry, to preserve claims relating to fraudulent conveyances).  Because CCTC is seeking several equitable remedies in connection with the escrow funds, including claims for disgorgement, ECF No. 5 at 29, ¶ 84, constructive trust, *id.* at 34, ¶ 131, and restitution based on unjust enrichment, *id.* at 34-35, ¶¶ 135-139, injunctive relief to

prevent the Counter-defendants from dissipating the escrow funds is expressly permitted, and in fact warranted, under Ninth Circuit precedent.

In addition, and independently sufficient to warrant injunctive relief in this matter, are cases holding that depletion of escrow funds on its own constitutes irreparable harm. *See* Motion, at 18-19. Once again, this includes cases in this Circuit, in which courts have granted injunctive relief like the relief sought here, to prevent the transfer or dissipation of funds that were supposed to be held in an escrow account. *See Turner Entertainment Networks, Inc. v. Warrior Poets, Inc.*, No. CV 18-2490-R, 2018 WL 8755496, at \*2-3 (C.D. Cal. Jun. 25, 2018) (granting injunctive relief to prevent the depletion of escrow funds, and finding that "Plaintiff . . . will suffer irreparable harm if the funds are depleted before the litigation has ended."); *Zhang v. Am. Franchise Regional Center, LLC*, No. CV 15-9583-R, 2015 WL 13947105, at \*1-2 (C.D. Cal. Dec. 18, 2015) (granting injunctive relief by (i) enjoining the transfer of escrow funds, (ii) requiring that the funds be deposited with the court, and (iii) finding that "[i]rreparable harm will result if this Court does not immediately order a freeze of the assets because once Plaintiff's investment is disbursed, there is no guarantee that Defendant will safeguard those funds pending the resolution of Plaintiff's underlying claims").

The basis for injunctive relief under these legal principles is made even more clear by the content of the Opposition. While CCTC believed that there was some foul play between Capital Pure and its purported "neutral" escrow agent Chrisman, Counter-defendants have now **admitted** that Capital Pure is exerting control over the escrow funds improperly, and trying to create conditions under which **it**, and not Chrisman, will agree to release the funds, or at least a portion of them. *See* Opposition, at 9; Declaration of Shiva Prakash, attached as Exhibit 1 to the Opposition (ECF No. 26-1), ¶ 16 (declaring under penalty of perjury that "CPA remains willing to reimburse the funds to CCTC, provided that CCTC agrees to CPA's terms in the proposed Release."). Not only is it wholly improper for the Counter-defendants to now condition the release of the escrow funds on requirements never agreed to by the parties, but in no event should Capital Pure be the one to make that decision. Instead, it is Chrisman who was responsible at all times to keep the funds sequestered from both Capital Pure and CCTC, and his silence in this case speaks

volumes.  Because Capital Pure has apparently taken control over the escrow funds, without any basis under the Escrow Agreement or otherwise that allow them to do so, CCTC undoubtedly faces irreparable harm if an injunction is not issued, because the Counter-defendants have purported to create their own rules regarding the use and release of the escrow funds, and they have already engaged in misconduct relating to the same.

Another exception to the general rule regarding monetary damages is that irreparable harm occurs where there is a breach of trust by an individual holding property that belongs to others. *See* Motion, at 19-20 (citing *Bates Energy Oil & Gas, LLC v. Complete Oil Field Servs., LLC*, No. SA-17-CA-808-XR, 2017 WL 4051569, at *7 (W.D. Tex. Sept. 13, 2017)).  This scenario is akin to a trustee's mismanagement of property held in trust, and the Nevada Legislature has made clear that injunctive relief is appropriate to enjoin a trustee from breaching the trust.  *See* NRS 163.115(3)(b).  That is exactly the situation here, where Chrisman, the "trustee," has gone radio silent, and has apparently allowed another party to exert possession and/or control over the trust property.  Chrisman has wholly failed as an escrow agent and a fiduciary to CCTC, as he has ignored the company's requests for confirmation that the funds are still in the designated account, and that they had not otherwise been transferred or depleted.  *See* Motion, at 8-9.  CCTC faces a threat of irreparable harm, by way of a breach of trust, if the Court does not require that Chrisman and the Counter-defendants to (i) account for the funds, and (ii) refrain from any further misconduct relating to the funds, including a transfer or depletion of the same.

While CCTC includes all of these legal principles in the Motion, Counter-defendants did not provide a single argument as to why they do not apply.  In fact, the **only** thing Counter-defendants do other than simply recite the general rule that does not apply here, is argue that "CCTC presents no evidence whatsoever to support its disparaging remarks that CPA is allegedly a 'sham organization' or that CPA is not financially healthy."  *See* Opposition, at 8.  But once again, Counter-defendants miss the mark as they cannot ignore the weight of legal authority—and factual support—for CCTC's positions.

Counter-defendants apparently make this argument in response to the final exception to the general rule regarding monetary damages, also codified at NRS 33.310(3), which allows injunctive

relief where a defendant's conduct would render an eventual award of monetary damages ineffectual. *See* NRS 33.310(3). Counter-defendants contend that because they offered to return "over 96%" of the escrow funds to CCTC (without explaining where this arbitrary number comes from or what happened to the other 4%), upon CCTC's execution of a release that was drafted by Capital Pure and never contemplated or agreed to by the parties, and because Counter-defendant Shiva Prakash has declared that he is honest and an overall good guy, ECF No. 26-1, ¶ 18, there is no evidence to show that Counter-defendants will be insolvent, or unable to pay at least $336,000 by the end of this case. But the evidence in front of the Court shows otherwise.

Contrary to the Counter-defendants' claim that no evidence supports this theory, CCTC has shown the Court the following facts: **(1)** Counter-defendants' scheme is a textbook example of a scheme that is well-known to governmental authorities, *see [https://www.justice.gov/usao-edva/pr/fraudsters-sentenced-standby-letters-credit-scheme-1](https://www.justice.gov/usao-edva/pr/fraudsters-sentenced-standby-letters-credit-scheme-1)*; **(2)** notwithstanding their promises to deliver a Standby Letter of Credit ("SBLC") or return the escrow funds to CCTC, Counter-defendants have failed to make good on a single promise they have made to CCTC, even when the promise came from their attorneys, *see* Motion, at 6-11; **(3)** Capital Pure—a purported business with no known employees, but which is comprised of a father, son and stepmother—has no physical address and, instead, lists a UPS Store box on a website that provides exactly no detail about what the company actually does, *see* Motion, at 20; **(4)** Chrisman, a licensed attorney who agreed to be a fiduciary to both sides of this transaction, and who agreed to ensure that he would solely control and supervise the escrow funds, has never responded to a single request from CCTC, or its counsel, to confirm that the funds are still in the designated account and that they have not been improperly transferred or depleted by the Counter-defendants, *see* Motion, at 8-10; and **(5)** when Capital Pure has offered to return the escrow funds to CCTC, they have inexplicably only offered to return a portion of those funds, and even then, they have attempted to condition their return of the escrow funds on CCTC's agreement to completely release them from any liability. *See* Motion, at 9.

In addition to these facts, Counter-defendants have now confirmed that: **(6)** apparently Capital Pure—and not Chrisman—has control over any escrow funds that remain, *see* Opposition,

at 9; **(7)** Capital Pure is purporting to create conditions upon which the escrow funds can be released, instead of honoring the terms of the Escrow Agreement, *see id.*; **(8)** Counter-defendants have not accounted for the 4% of the escrow funds that they apparently do not intend to return, *see* Opposition, at 8; and **(9)** there is **still is no evidence**, by way of a bank statement or otherwise, that confirms either (a) the funds are still in the designated escrow account, or (b) all of the escrow funds remain unused.

Based on all of the evidence in front of the Court, including that CCTC still has no idea where the funds are being kept or what portion of the funds remain, the Court can and should find that a potential depletion or mismanagement of the escrow funds would constitute irreparable harm, or alternatively, that there is no sign of a legitimate business that would be able to pay the amount of $336,000 to CCTC, if it were to prevail on the escrow issues at trial.  CCTC has provided the Court with a number of distinct reasons and legal bases why irreparable harm exists, and the Opposition fails to refute any of them.

> **B.      CCTC Has Established a Likelihood of Success on the Merits of its Claims.**

Counter-defendants' second argument is that CCTC has not demonstrated a likelihood of success on the merits of its claims for breach of the escrow agreement, breach of fiduciary duties, and conversion.  *See* Opposition, at 9.  In particular, they argue that the Escrow Agreement was entered into as part of a larger transaction involving a joint venture between the parties, and that because the other claims in this case relate to that broad transaction, including Capital Pure's affirmative claim against CCTC, that CCTC must demonstrate a likelihood of success on the merits of **all claims in this case**, to obtain injunctive relief.  But this position is not supported by the facts, or by applicable law.

As an initial matter, there can be no reasonable dispute that for purposes of obtaining injunctive relief, a party must only show a likelihood of success on the merits of the claims that relate to the relief being sought, and not all the claims in a case overall.  *See, e.g.*, *Carmichael v. Aranas*, No. 3:17-cv-00025-MMD-WGC, 2017 WL 1712518, at *4 (D. Nev. May 2, 2017) (affirming the Magistrate Judge's finding that a likelihood of success on the merits was found with respect to one claim on one issue, and thus a preliminary injunction was appropriate with regard

8

to that issue).  With that being said, the injunctive relief being sought by CCTC in the Motion **only** deals with the parties' discrete obligations set forth in the Escrow Agreement, which are not affected by any disputed facts relating to the Joint Venture Agreement or any other arrangements between the parties.

To be precise, the relief requested by CCTC is meant to ensure that the escrow funds are accounted for and not depleted throughout the pendency of this case.  *See* Motion, at 24.  This relief implicates three claims, as noted in the Motion: (i) the claim that Chrisman and/or Chrisman, P.C. breached the Escrow Agreement, by (a) failing to initiate the demand procedures set forth in the Escrow Agreement, (b) failing to release the escrow funds to CCTC upon its demand, and in the absence of an objection by Capital Pure, and (c) failing to respond to CCTC when it asked for confirmation of where the funds actually were, *see* Motion, at 16; (ii) the claim that Chrisman and/or Chrisman, P.C. breached their fiduciary duties through the same conduct, *see id.* at 16-17; and (iii) the claim that Counter-defendants converted the escrow funds by exerting control over the same in contravention of the Escrow Agreement.  *See id.* at 17.

CCTC has established that it has a likelihood of success on the merits of these claims.  In fact, the proof needed to do so is not extensive.  CCTC has shown—and the parties do not dispute—that: (i) they entered into the Escrow Agreement, *see* ECF No. 26-3 (Counter-defendants' copy of the Escrow Agreement); (ii) CCTC deposited $336,000 into the escrow account designated by the parties, *see* ECF No. 26-1 ("The amount of $336,000.00 was placed by CCTC into escrow . . . ."); (iii) the parties' transactions, including issuance of the SBLC, never materialized, *see* Opposition, at 6 ("Unfortunately, though the SBLC process began, it ultimately was never able to be completed . . . ."); (iv) CCTC made numerous demands for the escrow funds, as well as information relating to the same, *see* Motion, at 8-11; (v) neither Chrisman nor Chrisman, P.C. ever responded, *see id.* at 8-10; and (vi) Capital Pure now states that it has control over the escrow funds.  *See* Opposition, at 9.

There are no disputes regarding these simple facts, and Counter-defendants have provided absolutely no legal basis—under the Escrow Agreement or otherwise—why Capital Pure would be entitled to receive the escrow funds.  Nor have Counter-defendants provided any evidence to

dispute that Chrisman and Chrisman, P.C. completely failed to initiate the demand process required by Section 3.3 of the Escrow Agreement, or to show that they ever responded to CCTC's requests for information regarding the escrow funds. On these facts alone, CCTC has shown a likelihood of success on the merits of its claims.

There is nothing in the Joint Venture Agreement or the parties' arrangements otherwise, that would change this outcome. The **only** thing in the Joint Venture Agreement that could possibly change where the escrow funds were supposed to go is in the event the SBLC was issued and the escrow funds were "released to the bank to pay for this transmission of the SBLC to monetizer bank." *See* ECF No. 22-2 (copy of the Joint Venture Agreement), Page 3 of 15 (Section 3(E)). But once again, the parties agree that the SBLC was never issued, and Counter-defendants have pointed to no reason why they would be entitled to have received the escrow funds, or why the escrow agent was excused from performing his duties to supervise and control the escrow funds in accordance with the terms of the Escrow Agreement. In addition, because Chrisman and Chrisman, P.C. are not even parties to the Joint Venture Agreement or any other agreement between the parties, the obligations under the Escrow Agreement, which relate to the claims at issue, remain independent. CCTC has satisfied the requirement of showing a likelihood of success on the merits of its claims, as they relate to the escrow funds, and injunctive relief is necessary to prevent the Counter-defendants from continuing to unlawfully exert control over them, and from continuing to deplete them.

### C. Counter-defendants Do Not Challenge that the Balance of Equities and Public Interest Weigh in Favor of a Preliminary Injunction Being Issued.

It is worth noting, that while Counter-defendants make arguments regarding the irreparable harm and likelihood of success on the merits requirements relating to injunctive relief, they do not contest the analysis regarding the third and fourth factors to be considered by the Court, including (i) the balance of the hardships of the parties, and (ii) the public interest involved. The Court should therefore take this non-response as a concession that those factors weigh in favor of an injunction being granted, as fully set forth in the Motion.

/ / /

**D.** **The Court Should Compel the Counter-defendants to Deposit the Escrow Funds with the Court.**

Counter-defendants' final argument in the Opposition is that the Court should not compel them to deposit the escrow funds with the Court. They rely on one case, without advising the Court that it was reversed and remanded, but which in any event appears to be cited—yet again—for the general principle that money damages do no constitute irreparable harm. But once again, this argument is without merit.

With regard to the substance of Counter-defendants' argument on this issue, they argue that the Court should not require that the escrow funds be deposited, because Capital Pure "offered to reimburse CCTC the sum of $324,240 in March of 2024," and that it still is willing to reimburse that amount. *See* Opposition, at 11. But as set forth numerous times above, CCTC is left scratching its head as to why Capital Pure is (i) asserting any control over the funds in the first place, or (ii) offering to return **only a portion** of the funds at issue. These facts should give the Court even more concern as far as (a) how Capital Pure obtained control over the funds that Chrisman and Chrisman, P.C. were supposed to be in sole possession of; (b) why only a portion of the funds are being offered; (c) where the funds are, in the absence of any evidence of that fact; and (d) why the purported escrow agent responsible for the safekeeping of the funds, who was supposed to be a fiduciary of CCTC, has said absolutely nothing.

Counter-defendants have done nothing but solidify why a neutral safekeeping of the escrow funds is necessary in this case, and the Court should award such relief as a non-controversial, remedial measure. To be clear, CCTC is not requesting that the Court give the funds to CCTC, or that it make any judgments regarding the merits of this case. It is only asking the Court to ensure that the funds still exist by the end of this case, and on this issue, it is asking that the Court hold the escrow funds neutrally—as they are supposed to be held in any event—while the parties litigate the issues between them.

## III. CONCLUSION

As set forth above, the Opposition crystallizes why the relief sought in the Motion is imperative. CCTC is asking that the Court require the Counter-defendants to: (i) account for the

funds and show the Court where they are; and (ii) not transfer or otherwise misuse the funds throughout the pendency of this litigation. In the alternative, as it is clear that Chrisman and Chrisman P.C. have not maintained neutral control over the funds as they were required to keep safe, the Court should require the Counter-defendants to deposit those funds with the Court, to ensure their safekeeping throughout the pendency of this case. Without such relief, CCTC faces a near guarantee that the Counter-defendants continue to play games with the escrow funds, and that by the end of this case, there will be nothing left.

Dated this 23rd day of August, 2024.

SKLAR WILLIAMS PLLC

*/s/ David B. Barney*_____
Stephen R. Hackett, Esq. (NBN: 5010)
David B. Barney, Esq. (NBN: 14681)
410 South Rampart Blvd, Suite 350
Las Vegas, NV 89145
*Attorneys for Defendant/Counterclaimant*
*CC Technology Corporation*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on the 23rd day of August, 2024, a true and correct copy of the above and foregoing **DEFENDANT/COUNTERCLAIMANT CC TECHNOLOGY CORPORATION'S REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION OR, IN THE ALTERNATIVE, TO COMPEL DEPOSIT OF ESCROW FUNDS WITH THE COURT** was filed electronically with the Clerk of the Court by submission to the electronic filing and service system (CM/ECF) at the United States District Court, District of Nevada. CM/ECF will provide copies to all parties and counsel of record registered to receive CM/ECF notification.

*/s/ David B. Barney*_____
An employee of Sklar Williams PLLC

13