**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| CAPITAL PURE ASSETS, LTD., | Case No. 2:24-cv-00680-NJK[1] |
| Plaintiff(s), | |
| v. | **ORDER GRANTING PRELIMINARY INJUNCTION** |
| CC TECHNOLOGY CORPORATION, | [Docket Nos. 22, 23] |
| Defendant(s). | |

Pending before the Court are Counterclaimant CC Technology Corporation's ("CCTC") motion for preliminary injunction, Docket No. 22, and motion to compel deposit of funds, Docket No. 23. Counter-Defendants[2] filed a response. Docket No. 26. CCTC filed replies. Docket Nos. 29-30. The Court held a hearing on September 20, 2024. Docket No. 41.[3]

**I.   BACKGROUND**

This case arises out of discussions and agreements to engage in a joint venture, including CCTC's deposit of $336,000 into an escrow account. Docket No. 22-1 at ¶ 8. The escrow funds were the initial step for the parties to allegedly pursue investment projects vis-à-vis standby letters of credit. Capital Pure alleges that the joint venture was meant to focus on a real estate project in Chicago, *see* Docket No. 1 at ¶¶ 15-22, and that CCTC failed to perform its duties in finding viable projects, *see id.* at ¶¶ 40-57. CCTC alleges that the joint venture was meant to focus on its

---

[1] On August 19, 2024, the case was referred to the undersigned magistrate judge on the parties' consent. Docket Nos. 27, 28.

[2] The case initially involved claims brought by Capital Pure Assets, Ltd. ("Capital Pure") against CCTC. *See* Docket No. 1. CCTC's counterclaims are brought against Capital Pure and those associated with it, Shiva Prakash ("Shiva"), Hannah Dawn Prakash ("Hannah"), and Vikhyat Prakash ("Vikhyat"). *See* Docket No. 5 at ¶¶ 7-10. According to Capital Pure's complaint, Shiva is its chairman, Hannah is its chief executive officer, and Vikhyat is its strategic advisor. Docket No. 1 at ¶ 5; *see also* Docket No. 26-1 at ¶ 2. The counterclaims are also brought against those allegedly handling the escrow, Chrisman P.C. and James Chrisman. *See* Docket No. 5 at ¶¶ 11-12. The Court will refer to these parties individually as warranted or collectively as "Counter-Defendants."

[3] Because a transcript of the hearing has not been produced, the Court cites herein to the hearing's audio recording.

1

1   "CannaCard" payment system, *see, e.g.*, Docket No. 5 at ¶ 24,[4] but that the joint venture agreement

2   was a sham standby letter of credit scheme and that Capital Pure never intended to move forward

3   with any project, *see, e.g.*, *id.* at ¶¶ 70-78 (alleging fraud).  CCTC also alleges that it sought return

4   of the escrow funds pursuant to the parties' escrow agreement, but that the funds have been

5   wrongfully withheld.  *See, e.g.*, *id.* at ¶ 56.

6        The parties are before the Court on CCTC's motions seeking two orders in the alternative:

7   (1) an injunction against Counter-Defendants transferring or dissipating the escrow funds, and (2)

8   an order requiring Counter-Defendants to deposit the escrow funds with the Court Clerk.  *See*

9   Docket Nos. 22, 23.  After the motions were filed, Counter-Defendants represented that the funds

10  were already transferred out of escrow in or about September 2023.  *See, e.g.*, Hearing Rec.

11  (9/20/2024) at 1:33 – 1:34 p.m.  In light of this new revelation, CCTC's requests for relief merged

12  into a single request for a preliminary injunction[5] requiring Counter-Defendants to deposit

13  $336,000 into the Court's registry for safekeeping during these proceedings.  *See id.* at 1:31 p.m.

14  **II.     STANDARDS**

15       Adjudicating motions for preliminary injunction in diversity cases follows a two-step

16  process.  First, the Court determines whether that remedy is available under state law.  *See Sims*

17  *Snowboards, Inc. v. Kelly*, 863 F.2d 643, 647 (9th Cir. 1988) ("The general equitable powers of

18  federal courts should not enable a party suing in diversity to obtain an injunction if state law clearly

19  rejects the availability of that remedy").  Second, the Court applies federal law to determine

20  whether an injunction should issue.  *See Travelers Cas. & Sur. Co. of Am. v. Williams Bro., Inc.*,

21  No. 2:12-cv-0058-LDG-NJK, 2013 WL 5537191, at *2 (D. Nev. Oct. 4, 2013) (collecting cases);

22  *accord Ink Projects, LLC v. Ruben Kasper, LLC*, No. 2:23-cv-01568-JCM-BNW, 2024 WL

23  2750758, at *2 (D. Nev. May 28, 2024).  The federal standards are well-established.  A preliminary

24

25  _____

      [4] There is an answer portion of this document and a counterclaims portion of this document.
26  The paragraph citations herein are made to the counterclaims portion of the filing.

27       [5] There is some suggestion in the briefing that the Court may compel a party to deposit
    funds pursuant to its inherent authority based on a showing less than what would be required for a
28  preliminary injunction.  *See* Docket No. 23 at 23-24.  Because the Court finds that the preliminary
    injunction standards are met, the Court need not opine on whether a lesser showing might suffice.

injunction is an "extraordinary and drastic remedy" that is never awarded as of right. *Munaf v. Geren*, 553 U.S. 674, 689-690 (2008). Courts consider the following elements in determining whether to issue a preliminary injunction: (1) a likelihood of success on the merits; (2) likelihood of irreparable injury if preliminary relief is not granted; (3) balance of hardships; and (4) advancement of the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).[6] The movant ultimately bears the burden of making a "clear showing" of the need for the extraordinary remedy of a preliminary injunction. *Winter*, 555 U.S. at 22. In resolving a motion for preliminary injunction, the Court may rely on declarations and exhibits, as well as giving some weight to hearsay and other inadmissible evidence. *See, e.g.*, *Johnson v. Couturier*, 572 F.3d 1067, 1083 (9th Cir. 2009).

## III.   ANALYSIS

### A.   STATE LAW

The first step in the analysis is to determine whether state law prohibits injunctive relief for the claims at issue. *See Sims Snowboards*, 863 F.2d at 647. CCTC argues that state law permits injunctive relief pursuant to N.R.S. 33.010. *See* Docket No. 22 at 12. That statute provides that an injunction may be granted in the following cases:

> 1. When it shall appear by the complaint that the plaintiff is entitled to the relief demanded, and such relief or any part thereof consists in restraining the commission or continuance of the act complained of, either for a limited period or perpetually.
>
> 2. When it shall appear by the complaint or affidavit that the commission or continuance of some act, during the litigation, would produce great or irreparable injury to the plaintiff.
>
> 3. When it shall appear, during the litigation, that the defendant is doing or threatens, or is about to do, or is procuring or suffering to be done, some act in violation of the plaintiff's rights respecting the subject of the action, and tending to render the judgment ineffectual.

N.R.S. 33.010(1)-(3). CCTC's requested preliminary injunctive relief to protect its escrow funds from dissipation or concealment $336,000 "would fall squarely" under both subsections (2) and

---

[6] Courts sometimes use a sliding scale approach. *See Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131-33 (9th Cir. 2011). CCTC makes the required showings without the need to apply the sliding scale approach.

(3) of this state law provision.  *Cf. Williams Brother*, 2013 WL 5537191, at *2.  Moreover, Counter-Defendants provide no argument that the injunction sought does not fall within this state law provision discussed in the motion.  *Cf. Stichting Pensioenfonds ABP v. Countrywide Fin. Corp.*, 802 F. Supp. 2d 1125, 1132 (C.D. Cal. 2011) (collecting cases that "failure to respond in an opposition brief to an argument put forward in an opening brief constitutes waiver or abandonment in regard to the uncontested issue").

### B.   LIKELIHOOD OF SUCCESS ON THE MERITS

Having determined that the injunctive relief sought is authorized by state law, the Court turns to the federal standards as to whether an injunction should issue.  CCTC seeks injunctive relief predicated on its counterclaims for breach of the escrow agreement, breach of fiduciary duty, and conversion.  *See* Docket No. 22 at 15-18.  A breach of contract claim requires (1) the existence of a valid contract, (2) a breach of the contract, and (3) damage as a result of the breach.  *Medical Providers Fin. Corp. II v. New Life Ctrs., L.L.C.,* 818 F. Supp. 2d 1271, 1274 (D. Nev. 2011). Generally, a contract is valid and enforceable if there has been "an offer and acceptance, meeting of the minds, and consideration." *May v. Anderson,* 119 P.3d 1254, 1257 (Nev. 2005).  "A claim for breach of fiduciary duty customarily has three elements:  (1) existence of a fiduciary duty, (2) breach of the duty, and (3) damages as a result of the breach." *Guzman v. Johnson*, 483 P.3d 531, 538 (Nev. 2021).  Conversion is "a distinct act of dominion wrongfully exerted over another's personal property in denial of, or inconsistent with his title or rights therein or in derogation, exclusion, or defiance of such title or rights." *Evans v. Dean Witter Reynolds, Inc.*, 5 P.3d 1043, 1048 (Nev. 2000).

After introductions through a third-party, Thomas Gavin ("Gavin")[7] and another CCTC official met with Shiva and Vikhyat.  Docket No. 22-1 at ¶¶ 4-5.  Shiva and Vikhyat told Gavin that Capital Pure had "extensive experience and success working with businesses in a variety of industries, including technology, defense, aerospace, and hospitality.  They also promised us that they could draw upon tens of millions of dollars of funding instantly, from their clients' family

---

[7] Gavin is a member of the board of directors of CCTC.  *See* Docket No. 22-1 at ¶ 1.

offices in India." *Id.* at ¶ 5.  That meeting was followed by another meeting in which Shiva and Vikhyat repeated their assertions of Capital Pure's success and funding abilities.  *Id.* at ¶ 6.  In reliance on those representations, CCTC agreed to enter into a joint venture with Capital Pure in which Capital Pure would provide millions of dollars of funding to CCTC for CCTC's use in connection with its projects and the parties would split the profits of those projects.  *Id.*  The joint venture agreement was entered on or about June 26, 2023.  Docket No. 22-2.

The joint venture agreement contemplated funds being deposited into escrow, so the parties also entered into an escrow agreement on or about July 5, 2023.  *See* Docket No. 22-1 at ¶ 7; Docket No. 22-3 (escrow agreement).  The escrow agreement includes the following provisions:

> 3.2  ESCROW shall release the Deposit to INVESTOR as directed:
>
>> 3.2.1 pursuant to the terms and conditions set forth in the JV Agreement and this Agreement, upon receipt of (a) An MT799 issued from Investor's Bank to Monetizer Bank; (b) A Term Sheet from the Monetizer Partner; and (c) An MT799/MT199 Issued from the Monetizer's Bank to the Investor's Bank[;] or
>>
>> 3.2.2. in a subsequent writing signed by both JV Partner, and Investor; or
>>
>> 3.2.3 by a final, non-appealable order or judgment of a court.
>
> 3.3 If ESCROW is not directed to release the Deposit pursuant to paragraph 3.2 above, and ESCROW receives a request by either INVESTOR or JV PARTNER, to release the Deposit, then ESCROW must give both the JV PARTNER, and INVESTOR prior written notice of not fewer than thirty (30) business days before releasing the Deposit.  If ESCROW has not received notice of objection to the release of the Deposit prior to the expiration of said thirty (30) day period, the Deposit shall be released, and ESCROW shall provide further written notice to all parties JV PARTNER, and INVESTOR informing them of said release.  If ESCROW receives a written notice from either JV PARTNER or INVESTOR objecting to the release of the Deposit within said thirty (30) day period, ESCROW shall continue to hold the Deposit until otherwise directed pursuant to paragraph 3.2 above.  Notwithstanding the foregoing, ESCROW shall have the right at any time to deposit the DEPOSIT in the ESCROW Account with the Clerk of the county where the Bank is located and shall give written notice to both INVESTOR, and JV PARTNER, of such deposit.

Docket No. 22-3 at 3-4.

Pursuant to the terms of the joint venture agreement and the escrow agreement, on or about July 7, 2023, CCTC wired $336,000 into the escrow account designated by Capital Pure and the escrow agent, Chrisman, P.C.  Docket No. 22-1 at ¶ 8; *see also* Docket No. 22-4 at 2 (wire transfer record).  After the funds were transferred to escrow, Gavin placed a series of phone calls to Capital Pure regarding the lack of movement on Capital Pure's part under the joint venture agreement.  Docket No. 22-1 at ¶ 9.  Capital Pure responded by assuring Gavin that the funding was in process and, on August 23, 2023, indicated that Capital Pure was "in a position to get the funding" for the Cannacard project, that Capital Pure was "targeting the window of the week of September 15th for the distribution of funds," and that Capital Pure would "be in touch with updates."  *See id.*; *see also* Docket No. 22-5 at 2 (email from Vikhyat on August 23, 2023).

On September 21, 2023, after no funds had been distributed and there was still no movement on the part of Capital Pure, Gavin sent Capital Pure an email requesting the return of the escrow funds deposited by CCTC.  Docket No. 22-1 at ¶ 10; *see also* Docket No. 22-6 at 2.  Three hours later, Shiva responded to that email by indicating that "[w]e will process the termination of the escrow agreement signed by all parties, along with a termination of the JV agreement."  Docket No. 22-6 at 2.

Capital Pure did not process the return of the escrow funds.  *See* Docket No. 22-1 at ¶ 10.  Gavin followed up again with Shiva and, on September 29, 2023, they had a telephonic conversation during which Shiva represented that the "MT799 had already been processed, and that the funding was therefore on its way."  *Id.* at ¶ 11.  In reliance on that representation, CCTC withdrew its request for the return of the escrow deposit and CCTC agreed to continue forward with the alleged joint venture with Capital Pure.  *Id.*  Gavin had several more telephone calls and an in-person meeting in the weeks thereafter, during which Shiva and Vikhyat continued to promise that the funding was on its way.  *Id.* at ¶ 12.

As of November 2023, CCTC had still not seen any movement by Capital Pure as far as the funding of $20 million or the standby letter of credit being issued, so CCTC again reiterated that Capital Pure needed to provide proof that the funding would be delivered.  *Id.*  On or about December 6, 2023, Shiva sent Gavin a letter on Capital Pure letterhead regarding "the progress of

our joint venture, specifically regarding the final stages of monetization and funding." Docket No. 22-8 at 2. That letter blamed the intricacies of the process and the holiday season for further delay:

> Regarding the timeline, as you are aware, the final stages of project monetization are intricate, requiring meticulous attention to detail and compliance with various regulatory standards. Our team is diligently working to ensure that all aspects of the project are aligned with these requirements.
>
> However, it is important to acknowledge the impact of the upcoming holiday season. The end-of-year holidays typically see a slowdown in various operational processes, both within our firm and among our external partners and regulatory bodies. This seasonal period necessitates a brief hiatus in certain activities, which invariably affects project timelines.
>
> With this in consideration, we anticipate that the final monetization and funding phase of your project will be concluded in the first quarter of the following year around the Feb 1st week timeline. We expect that all necessary processes will resume promptly after the holiday break, and our team will be fully engaged in bringing this phase to a successful close.
>
> We understand that timing is crucial, and I assure you that we are committed to advancing your project with the utmost efficiency and care. Our team will maintain regular communication with you, providing updates and any support you may need during this period. We appreciate your understanding and patience as we navigate these seasonal adjustments.

*Id.*

Notwithstanding Capital Pure's continued promises to deliver funds, neither the funds nor the standby letter of credit was provided as of February 1, 2024. Docket No. 22-1 at ¶ 13. After further demands went unmet, Gavin sent a letter to Capital Pure and Chrisman, in his capacity as the escrow agent and the principal of Chrisman, P.C. *Id.*; *see also id.* at ¶ 14. That letter, dated March 1, 2024, demanded that, *inter alia*, the $336,000 in escrow funds be returned to CCTC immediately. *Id.* at ¶ 13; *see also* Docket No. 22-9 at 5 ("We require the escrow funds to be returned forthwith without delay or setoff, especially considering your total lack of performance"). Chrisman never responded to the demand letter. Docket No. 22-1 at ¶ 14.

On March 5, 2024, Gavin participated in a videoconference with Shiva regarding the demand letter. *See id.* at ¶ 16. Shiva indicated that Chrisman would not speak with anyone from CCTC unless they were physically present in Las Vegas. *See id.* Shiva also claimed that Capital

Pure had attempted to return the escrow funds, but the transfer was unsuccessful because CCTC's bank did not have the capacity to receive funds. *Id.* Shiva indicated that the funds could be delivered by providing a letter from the bank that it would accept the funds. *Id.* In addition to attempts to lure CCTC back into the underlying joint venture, Shiva promised the funds would be delivered within a month. *Id.*

The videoconference prompted Gavin to send follow up emails to Chrisman requesting confirmation that the $336,000 was still in the escrow account, along with supporting documentation, and, if the funds had been transferred, all supporting documentation and correspondence regarding such transfer. Docket No. 22-11 at 2. Although electronic notice shows that Chrisman received and opened that email, he did not respond. *See id.*; *see also* Docket No. 22-1 at ¶ 15. CCTC did not thereafter receive the escrow funds back. *See id.* at ¶ 17.

The above evidence establishes a strong likelihood of success on the merits as to these three counterclaims. There is no dispute that this is a valid contract, that damages flow from its breach, or that Chrisman owed a fiduciary duty to CCTC. Moreover, CCTC has shown a likelihood of establishing a breach of the contract and breach of fiduciary duty. CCTC demanded return of the escrow funds on or about March 1, 2024. *See* Docket No. 22-9; Docket No. 22-1 at ¶ 13. The record does not include evidence (or developed argument) that Counter-Defendants lodged an objection within 30 days of the demand letter. As a result, the escrow funds should have been returned to CCTC by plain reading of the contract provision identified above. In contravention of those rights, Counter-Defendants are wrongfully exerting control over the escrow funds in derogation of CCTC's rights. Hence, CCTC has shown a likelihood of success on these breach of contract, breach of fiduciary duty, and conversion counterclaims.

After the motion was filed, Counter-Defendants indicated that the escrow funds were transferred out of the designated escrow account months earlier, in or around September 2023. Hearing Rec. (9/20/2024) at 1:33 – 1:34 p.m.[8] CCTC argues that this new revelation does not alter

---

[8] Counter-Defendants stated plainly that they had transferred the escrow funds only after the briefing was completed on these motions, though they intimate that the transfer could have been divined from the more cryptic statements made in responding to the motions. *See* Hearing Rec. (9/20/2024) at 1:33 – 1:34 p.m.; *see also* Docket No. 26-1 at ¶¶ 13-14.

its likelihood of success because the circumstances warranting such a transfer pursuant to Paragraph 3.2.1 of the escrow agreement did not exist. *See, e.g.*, Hearing Rec. (9/20/2024) at 1:06 – 1:09 p.m.; *see also* Docket No. 22-3 at 3-4 ("3.2.1 pursuant to the terms and conditions set forth in the JV Agreement and this Agreement, upon receipt of (a) An MT799 issued from Investor's Bank to Monetizer Bank; (b) A Term Sheet from the Monetizer Partner; and (c) An MT799/MT199 Issued from the Monetizer's Bank to the Investor's Bank"). The Court agrees with CCTC that this revelation does not alter the likelihood of success here, as there are a number of problems with Capital Pure's position. The most obvious problem is that the Court has been presented with no meaningfully developed explanation from Capital Pure as to how sufficient circumstances could possibly have existed that would have warranted Capital Pure transferring these funds out of escrow. In fact, counsel for Counter-Defendants at the hearing was unprepared to make such an argument. *See* Hearing Rec. (9/20/2024) at 1:36 p.m. (counsel for Counter-Defendants indicating that he was unsure whether a viable project had to be identified before the funds could be transferred out of escrow).[9] As best the Court can discern, Capital Pure's position is predicated on a conclusory, vague, and self-serving declaration that Shiva had "informed Thomas Gavin that the MT799 Pre-Advice message had already been obtained," *see* Docket No. 26-1 at ¶¶ 13-14; *see also* Hearing Rec. (9/20/2024) at 1:43 p.m. (counsel for Counter-Defendants acknowledging that the declaration was self-serving), but actual documentary evidence of that MT799 is notably absent from the record and counsel for Counter-Defendants represented at the hearing that he also does not have a copy of this document, *see* Hearing Rec. (9/20/2024) at 1:48 p.m. Even at this preliminary phase, Shiva's declaration is not given significant weight. *See, e.g.*, *William Brother*, 2013 WL 5537191, at *4. At any rate, the mere existence of an MT799 would not alone constitute sufficient grounds to transfer the escrow funds. *See* Docket No. 22-3 at 3-4 ("3.2.1 pursuant to the

---

[9] CCTC also identified numerous allegations in Capital Pure's own complaint that undercut its assertion that Capital Pure had sufficient grounds to transfer the funds. *See* Hearing Rec. (9/20/2024) at 1:08, 1:14 – 1:18 p.m.; *see also, e.g.*, Docket No. 1 at ¶ 37 ("for the process to be completed, including monetization—i.e., receiving cash loan proceeds from a bank that uses the [standby letter of credit] as collateral (Steps D-F above)—the parties needed to have an actual project that was ready to receive capital"). Rather than meaningfully grapple with these inconsistencies, counsel for Counter-Defendants suggested instead that "the complaint may need to be amended" to change the factual allegations. *See* Hearing Rec. (9/20/2024) at 1:35 p.m.

terms and conditions set forth in the JV Agreement and this Agreement, upon receipt of (a) An MT799 issued from Investor's Bank to Monetizer Bank; (b) A Term Sheet from the Monetizer Partner; **and** (c) An MT799/MT199 Issued from the Monetizer's Bank to the Investor's Bank" (emphasis added)).

In short, CCTC has established a likelihood of success on these counterclaims for breach of contract, breach of fiduciary duty, and conversion. In a last-ditch effort to stave off a finding of likelihood of success, Counter-Defendants argue that CCTC's likely success on its counterclaims is offset by its purported failure to preemptively rebut Capital Pure's competing claims that CCTC breached the joint venture agreement. *See, e.g.*, Docket No. 26 at 10-11. As a threshold matter and as noted by CCTC, Docket No. 29 at 8-9, no legal authority is provided in support of this contention and it would appear to be contrary to law for the Court to require CCTC—in order to obtain a preliminary injunction on its counterclaims—to preemptively rebut Capital Pure's claims. *See Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 429 (2006) ("the burdens at the preliminary injunction stage track the burdens at trial"). Even considering the respective evidentiary showings made as to Capital Pure's claims, however, CCTC remains likely to prevail on the merits. Meaningfully developed argument and evidentiary support has not been presented by Capital Pure as to its own claims against CCTC. In arguing that CCTC breached the joint venture agreement by failing to find viable investment options, Counter-Defendants rely on Capital Pure's allegations and on the conclusory, vague, and admittedly self-serving declaration of Shiva. *See* Docket No. 26-1; *see also* Hearing Rec. (9/20/2024) at 1:41, 1:43 p.m. As noted above, this declaration is not given significant weight. *See, e.g.*, *William Brother*, 2013 WL 5537191, at \*4. On the other side of the ledger, however, CCTC provided a detailed declaration for its position that it was Capital Pure that breached the joint venture agreement by not obtaining funding. Docket No. 22-1 at ¶¶ 9-13. CCTC's position is bolstered by written communications during this period in which Capital Pure indicated that <u>Capital Pure was still working on getting funding</u>, which was the reason the joint venture had not advanced. *See* Docket No. 22-8 at 2 (letter from Shiva dated December 6, 2023); Docket No. 22-5 (email from Vikhyat on August 23, 2023). Moreover, as argued by CCTC's counsel, *see* Hearing Rec.

(9/20/2024) at 1:15 - 1:16 p.m., Counter-Defendants' contention that CCTC failed to provide viable investment options is inconsistent with Capital Pure's own statements regarding moving forward with CCTC's project, *see* Docket No. 22-8 at 2 (letter from Shiva dated December 6, 2023, stating that, "[f]irstly, I would like to express our excitement about the potential of CannaTrac and CC Technology Corp in the realm of customer rewards and real-life gifts in the cannabis industry"); Docket No. 22-5 at 2 (email from Vikhyat on August 23, 2023, indicating that "[w]e are in position to get the funding to CannaCard").  Hence, the record at this juncture reflects that it was Capital Pure that failed to live up to its side of the bargain for the joint venture agreement, not that CCTC breached it.  Given the state of the record, CCTC is likely to prevail on the case as a whole, even considering Capital Pure's allegations in its complaint and the conclusory declaration of Shiva.

    C.    IRREPARABLE INJURY

    Purely economic harm is generally not considered irreparable because money lost may be recovered later during the ordinary course of litigation.  *Idaho v. Coeur d'Alene Tribe*, 794 F.3d 1039, 1046 (9th Cir. 2015).  Nonetheless, economic harm may be deemed irreparable when there is an impediment to recovering damages through the ordinary course of litigation.  *See id.*  "[A] district court has authority to issue a preliminary injunction where the [movant] can establish that money damages will be an inadequate remedy due to impending insolvency of the [opposing party] or that [the opposing party] has engaged in a pattern of secreting or dissipating assets to avoid judgment."  *Hilao v. Marcos*, 25 F.3d 1467, 1480 (9th Cir. 1994).  The Ninth Circuit has also brushed aside a challenge to a preliminary injunction requiring funds to be deposited with the Court when those funds were the subject of equitable relief sought in the case and evidence raised concern that the funds were fraudulently transferred.  *Thomas, Head & Greisen Emps. Tr. v. Buster*, 95 F.3d 1449, 1456-57 (9th Cir. 1996) (affirming subsequent sanctions for violating joint-and-several injunction to deposit funds with the registry of the court).

    CCTC has shown a likelihood that the escrow funds will be dissipated and that Counter-Defendants will otherwise hinder CCTC's ability recover the funds.  As a starting point, Counter-Defendants now admit that the funds were removed from the escrow account despite the

contractual provisions discussed above.  Hearing Rec. (9/20/2024) at 1:33 – 1:34 p.m.  The Court also agrees with CCTC that Counter-Defendants have engaged in evasive behavior, including a history of yanking CCTC's chain as it sought the return of these escrow funds.  *See* Docket No. 22-1 at ¶¶ 10-18.  Despite now asserting that they were transferred at an earlier date, Counter-Defendants were still referencing the funds as being held in escrow as recently as a few months ago.  Docket No. 22-15 at 2 (email from April 8, 2024, stating that "Capital Pure Assets will instruct the Escrow that it does not object to the release of the escrow funds and that they should be returned to the source account from which they were sent"); Docket No. 22-16 at 2 (email from April 25, 2024, representing that Capital Pure "reconsidered its position on the escrow and objects to the escrow amount being returned, even if a proper request had been made (which it has not)").[10] Counter-Defendants continue to be less than transparent as to the circumstances of these funds to this day.  *See* Docket No. 29 at 2-3 (discussing opposition papers and declaration).  At the hearing set on these motions, in fact, counsel for Counter-Defendants was unable to answer basic questions, including which account the funds were transferred into, where the funds are now, who owns/controls the account where the funds are now, and who is the purported third-party monetizer banking institution.  *See, e.g.*, Hearing Rec. (9/20/2024) at 1:35-1:37 p.m.[11]  Counter-Defendants also provide no factual response to CCTC's contention that Capital Pure runs a shadowy business as is highlighted by the fact that its skeletal website provides a physical address at a UPS store.  *See* Docket No. 22-13 at ¶ 6; Docket No. 22-17; *see also* Hearing Rec. (9/20/2024)

---

[10] Counter-Defendants belatedly objected to these exhibits, and one other exhibit, in a status report meant to address a different issue.  Docket No. 38 at 3-4 (citing Fed. R. Evid. 408).  The Court overruled the objections as improperly presented and waived.  Docket No. 39 at 1-2 & n.2.  In addition, the reliance on these exhibits to show irreparable injury is not prohibited by Rule 408 at any rate.  *See, e.g.*, *BitTitan v.SkyKick, Inc.*, No. C15-0754 RSM, 2015 WL 5081130, at *8 n.3 (W.D. Wash. Aug. 27, 2015) ("the evidence is presented to establish whether there would be irreparable harm to BitTitan which could not be compensable by money damages, not the validity of the claim or amount of the harm.  Accordingly, the Court finds the evidence admissible for that purpose and considers it accordingly").  While these exhibits are significant, the Court also notes a sufficient showing of irreparable harm even were they not considered.

[11] To be perfectly clear, Counter-Defendants have not even supported their contention that the funds were transferred with any kind of firm evidence, relying instead on vague assertions in Shiva's declaration and representations of counsel.

at 1:46 p.m. (counsel for Counter-Defendants first indicating that he was unaware of Capital Pure's physical address, but then acknowledging that its address is in fact a UPS store).

Against all of that evidence, Shiva attempts to provide assurance in the vaguest of terms that "[t]he funds in question have been and remain within the confines of the banking/monetizer institutions." Docket No. 26-1 at ¶ 15. Again, this type of self-serving declaration unsupported by evidence is not given significant weight, *see, e.g.*, *William Brother*, 2013 WL 5537191, at *4, and is contrary to the representations of Counter-Defendants' counsel at the hearing, Hearing Rec. (9/20/2024) at 1:47 p.m. ("it's not *the* funds that are available, it's that the client has the ability to reimburse separate funds in order to achieve a settlement" (emphasis added)). The Court also notes that Counter-Defendants repeatedly reference an "open offer" that they reimburse CCTC the $336,000, *e.g.*, *id.* at 1:45, 1:53 p.m., and, yet, Counter-Defendants inexplicably refuse to deposit $336,000 in the registry of the court, *cf. in re Villa Marina Yacht Harbor, Inc.*, 984 F.2d 546, 548-49 (1st Cir. 1993) (finding appeal of order to deposit funds to be frivolous in case where the appellant indicated it was willing to pay those funds to the appellee). In short, these representations by Shiva and Counter-Defendants' counsel fail to assuage the concerns that CCTC will likely be irreparably harmed by the diminution or disappearance of these funds.[12]

In short, CCTC has established a likelihood of irreparable harm without issuance of an order requiring the deposit of $336,000.

D.    BALANCE OF HARDSHIPS AND PUBLIC INTEREST

The final two factors for a preliminary injunction are the balance of hardships and the advancement of the public interest. *Winter*, 555 U.S. at 20. CCTC argues that the balance of hardships clearly weighs in favor of an injunction because under no scenario would Counter-

---

[12] Counter-Defendants repeatedly argue that they cannot deposit the "escrow funds" with the Court because they already transferred the funds. *See, e.g.*, Hearing Rec. (9/20/2024) at 1:49 p.m. To repeat, Shiva swears to Capital Pure having plenty of money and, further, that "[t]he funds in question have been and remain within the confines of the banking/monetizer institutions." Docket No. 26-1 at ¶ 15. By their own admissions, then, it should not be difficult for Counter-Defendants to trace the escrow funds that they transferred and to deposit those funds with the Clerk's Office. *Cf. Thomas, Head & Greisen*, 95 F.3d at 1455-56 (affirming sanctions imposed for failing to deposit $125,000 with the registry of the court to reflect "the $125,000 that was previously in . . . [a] trust account").

Defendants be entitled to the escrow funds, while CCTC risks losing the relief it seeks in the return of the funds in the event an injunction does not issue. Docket No. 22 at 21. CCTC also argues that the public interest favors issuance of an injunction given the purpose behind escrow agents to hold funds in a secure manner, which fiduciary duty the record at present shows was not upheld. *See id.* at 21-22. Counter-Defendants waived any contrary argument by not raising it in responding to the motion. *Stichting Pensioenfonds*, 802 F. Supp. 2d at 1132. The Court finds that these factors weigh in favor of issuance of a preliminary injunction here.

## IV.  CONCLUSION

For the reasons discussed above, CCTC's motions for preliminary injunction and to compel the deposit of funds are **GRANTED** in that Capital Pure Assets, Ltd., Shiva Prakash, Hannah Dawn Prakash, Vikhyat Prakash, Chrisman P.C., and James Chrisman must deposit funds in the amount of $336,000 with the Clerk's Office to be placed into the registry of the Court. Capital Pure Assets, Ltd., Shiva Prakash, Hannah Dawn Prakash, Vikhyat Prakash, Chrisman P.C., and James Chrisman must comply with this order by noon on October 4, 2024, and must file a notice of compliance by 3:00 p.m. on October 4, 2024.[13]

IT IS SO ORDERED.

Dated: September 24, 2024

_____
Nancy J. Koppe
United States Magistrate Judge

---

[13] The movant must generally post a bond with issuance of a preliminary injunction, Fed. R. Civ. P. 65(c), but "the bond amount may be zero if there is no evidence the party will suffer damages from the injunction," *Connecticut Gen. Life Ins. Co. v. New Images of Beverly Hills*, 321 F.3d 878, 882 (9th Cir. 2003) (citing *Gorbach v. Reno*, 219 F.3d 1087, 1092 (9th Cir. 2000)). An enjoined party waives any argument for a bond by failing to request one or to submit evidence regarding likely damages. *See Connecticut General*, 321 F.3d at 882-83. No bond was requested by Counter-Defendants and they submitted no evidence regarding likely damages if an injunction issued. The Court will not require a bond.